IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PULSE HEALTH LLC,

                Plaintiff,

       v.

AKERS BIOSCIENCES, INC.,

                Defendant.

No. 3:16-cv-01919-HZ

OPINION & ORDER

David H. Angeli
Kristen L. Tranetzki
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97205

Michael Rounds
BROWNSTEIN HYATT FARBER SCHRECK, LLP
5371 Kietzke Lane
Reno, NV 89511

      Attorneys for Plaintiff

Anthony J. DiMarino, III
Emmett S. Collazo
A.J. DIMARINO, P.C.
41 Grove Street
Haddonfield, NJ 08033

Jennifer Wagner
STOLL STOLL BERNE LOKTING & SCHLACHTER
209 SW Oak Street, Suite 500
Portland, OR 97204

      Attorneys for Defendant


HERNÁNDEZ, District Judge:

      Plaintiff brings three claims against Defendant: (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) unlawful trade practices in violation of Oregon Revised Statute § (O.R.S.) 646.608; and (3) breach of contract. Defendant moves to dismiss Plaintiff's claims. The Court held oral argument on March 10, 2017.

      The Court grants Defendant's motion to dismiss Plaintiff's Claims 1 and 2 for failure to state a claim. The Court denies Defendant's motion to dismiss Plaintiff's Claim 3 for lack of personal jurisdiction. The Court also denies Defendant's alternative motion to transfer venue. In sum, Plaintiff's third claim for breach of contract can proceed in this Court.

## BACKGROUND

      Defendant Akers Biosciences, Inc. ("Defendant") is a New Jersey corporation with its principal place of business in West Deptford, New Jersey. Akers Decl. Supp. Def.'s Mot. Dismiss ("Akers Decl.") ¶ 8, ECF 19. According to Defendant, it develops and sells diagnostic products and devices designed to deliver various health information test results with laboratory-level accuracy, but with cheaper and faster results. *Id.* at ¶ 5. Defendant is publicly held, with common stock traded on the NASDAQ Exchange and London Stock Exchange. *Id.* at ¶ 9.

Defendant has no place of business in Oregon and has no employees in Oregon. *Id.* at ¶¶ 7, 10, 11. However, on October 4, 2016, Defendant engaged an independent sales representative in Oregon for marketing and selling the OxiChek product at issue in this case. *Id.* at ¶ 15. Defendant also engages independent sales distributors that have made sales to a hospital in Corvallis, Oregon, totaling less than $15,000 since 2013. *Id.* at ¶ 14.

Plaintiff Pulse Health LLC ("Plaintiff") is an Oregon limited liability company with its principal place of business in Lake Oswego, Oregon. Compl. ¶ 1, ECF 1. Plaintiff formed in 2006 for the purpose of developing a product that can measure aldehyde molecules in human breath via a non-invasive hand-held device. Marsh Decl. ¶ 3, ECF 28. In pursuit of that goal, Plaintiff invented a hand-held computer system that could be used to measure certain health markers, such as aldehyde molecules, via a breath test. Compl. ¶ 9. Plaintiff had initially called this product the "Free Radical Enzymatic Device" or "FRED," but later changed the name of the device to "Revelar." *Id.* at ¶¶ 9, 18. Plaintiff currently employs fourteen people at its Portland, Oregon facility. *Id.* at ¶ 3.

Beginning in September of 2007, Plaintiff and Defendant entered into a number of contracts for the development and manufacture of a breath tube containing a chemical reagent that could accurately measure aldehyde molecules in human breath, to be used in conjunction with Plaintiff's FRED/Revelar device. *Id.* at ¶¶ 8-15; Marsh Decl. ¶ 9. Defendant had previously invented a test kit for a Blood Alcohol Test which took the form of a tube containing chemical reagents into which the test-taker would blow air. Compl. ¶ 10. The chemical reagents would react and change color based upon their interaction with alcohol present in the breath. *Id.* Defendant also invented another tube-and-reagent test that it claimed could detect the product of "free radical metabolism, such as aldehydes, MDA or peroxides, and react such substances with

a compound producing a color." *Id.* The parties entered into a Technology and Development Agreement ("TD Agreement") pursuant to which Defendant would design "New Versions" of its free radical test product in order for it to be used in combination with Plaintiff's hand-held FRED product. *Id.* at ¶ 11.

In addition to the TD Agreement, the parties simultaneously entered into a Supply and Manufacturing Agreement ("Supply Agreement"). The Supply Agreement provided that Defendant would manufacture the New Versions for Plaintiff to sell with its FRED/Revelar product if Defendant successfully developed and tested the New Versions of the free radical test tubes. *Id.*

The relationship between the parties and the circumstances surrounding the development of the New Versions changed in the following year. In December 2008, the TD Agreement and Supply Agreement were terminated in a Technology Transfer Agreement ("TT Agreement"). *Id.* at ¶ 12. Under the TT Agreement, Defendant assigned all intellectual property rights in the "Assigned Technology" to Plaintiff. *Id.* at ¶ 13. The "Assigned Technology" included all technology related to non-invasive exhaled breath testing. *Id.* The TT agreement provided Defendant with a license to use the Assigned Technology in the "ABI Field" which was limited to a handful of breath-test products related to diabetes, lung cancer, and alcohol detection. *Id.* at ¶ 14.

Under the TT agreement, Defendant agreed to complete research, development, and testing for the "Free Radical Technology" and Plaintiff agreed to pay a transfer fee of $3,000,000 in periodic payments through June of 2010. *Id.* The TT Agreement included an amended version of the previous Supply Agreement and provided for Defendant's potential manufacture and sale

of the "FRED Aldehyde Assay Tubes" (apparently the new moniker for the New Versions of Defendant's aldehyde test tubes). *Id.*

Defendant's development of the test tubes failed, according to Plaintiff. *Id.* at ¶ 16. Plaintiff determined in its testing laboratory that the chemical reagents developed by Defendant did not work. *Id.* According to Plaintiff, when the reagents in the tube changed color in reaction to a user's breath, the reagents were not detecting aldehydes, as they were supposed to. *Id.* Instead, the change in color in the tube (which the hand-held device reads to determine the amount of aldehyde molecules in the breath) was actually a result of the reagents reacting with humidified air (*i.e.* water) in the breath. *Id.* After Plaintiff determined that Defendant could not develop Free Radical Technology that successfully tested for accurate measurement of aldehydes in breath condensate, Plaintiff requested to part ways with Defendant. *Id.* The parties subsequently terminated all prior agreements between each other and entered into the April 8, 2011 Assignment, License, and Settlement Agreement ("Settlement Agreement") at issue in this action. *Id.* at ¶ 15.

The Settlement Agreement provided that Plaintiff assigned and transferred the Assigned Technology back to Defendant, and Defendant waived the remainder of Plaintiff's $3,000,000 payment. *Id.* at ¶ 17. The Settlement Agreement also provided that Defendant granted Plaintiff an exclusive and perpetual license to use the Assigned Technology in the field of Aldehyde Tests, which included any testing for oxidative stress, but excluded the "Defendant Field" of tests relating to diabetes, cancer, and alcohol. *Id.* The Settlement Agreement further provided that Defendant had no rights with respect to Plaintiff's Technology for its hand-held FRED/Revelar device. *Id.* at ¶ 18.

In approximately May of 2012, Plaintiff became aware that Defendant was selling a hand-held "Vivo" product that Defendant claimed measured oxidative stress and free radical damage through disposable tubes, which Plaintiff determined was a copy of Plaintiff's FRED/Revelar product in several respects. Compl. ¶ 19; Marsh Decl. ¶ 17. One of the former sales agents of Plaintiff was attempting to sell the Vivo product to Plaintiff's Oregon-based customers, and Plaintiff's law firm sent that former agent a cease–and–desist letter. Marsh Decl. ¶ 17. Both Defendant and the former sales agent thereafter stopped selling the Vivo product. *Id.*

In December 2015, Plaintiff became aware that Defendant was offering an "OxiChek" product for sale at a trade show in Las Vegas. *Id.* at ¶ 21. The Oxi-Check device uses a hand-held reader device in which a chemical reagent tube (the OxiChek product) is inserted after a person has exhaled breath into it. Compl. ¶ 21. The OxiChek device is supposed to measure free radicals such as superoxides, hydrogen peroxide, and aldehydes, and then send the results to a software application downloaded on a person's mobile phone or computer. *Id.* The software then displays oxidative stress and free radical results. *Id.*

After reviewing Defendant's OxiChek advertising materials, Plaintiff sent Defendant a cease-and-desist letter on March 1, 2016, complaining that Defendant may be using the Assigned Technology and Plaintiff's technology in breach of the parties' Settlement Agreement. *Id.* at ¶ 22. Plaintiff requested Defendant's technical materials showing the composition of its chemical reagents. *Id.* Defendant refused to remove its product from the market or provide any information concerning its OxiChek product. *Id.* at ¶ 23.

In July of 2016, Plaintiff obtained a sample of the OxiChek product by purchasing it from one of Defendant's distributors. *Id.* at ¶ 24. After analyzing the device, Plaintiff determined that the OxiChek product is a copy of the Assigned Technology and Pulse Technology. *Id.* The

chemistry for the OxiChek and the Assigned Technology reagents are the same, and the circuit

boards for the OxiChek product have a similar layout and the same optical chamber, LED,

diodes, switches and gates as the original FRED/Revelar device developed by Plaintiff. *Id.* at ¶¶

24-25.

## STANDARDS

### I.    Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency

of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "All allegations of material

fact are taken as true and construed in the light most favorable to the nonmoving party." *Am.*

*Family Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1120 (9th Cir. 2002). However, the

court need not accept conclusory allegations as truthful. *See Warren v. Fox Family Worldwide,*

*Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory

allegations which are contradicted by documents referred to in the complaint, and we do not

necessarily assume the truth of legal conclusions merely because they are cast in the form of

factual allegations.") (internal quotation marks, citation, and alterations omitted). Rather, to state

a plausible claim for relief, the complaint "must contain sufficient allegations of underlying

facts" to support its legal conclusions. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the

"grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly,* 550 U.S.

544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the

speculative level on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)[.]" *Id.* (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" which "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## II.     Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss on the grounds that the Court lacks personal jurisdiction. Personal jurisdiction over an out-of-state defendant involves two questions: whether jurisdiction exists under the forum state's long-arm statute and, if so, whether asserting personal jurisdiction is consistent with the limitations of the Due Process Clause of the federal Constitution. *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1248 (D. Or. 2013) (citing *Pebble Beach Co v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006)). These inquiries essentially merge because Oregon's long-arm statute extends jurisdiction to the outer limits of due process. ORCP 4(L); *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (when state long-arm statute reaches as far as the Due Process Clause, the court need only analyze whether the exercise of jurisdiction complies with due process); *Millennium Enters., Inc. v. Millennium Music, LP*, 33 F. Supp. 2d 907, 909 (D. Or. 1999) (because Oregon's catch-all jurisdictional rule confers personal jurisdiction coextensive with due process, the analysis collapses into a single question and the court proceeds under federal due process standards).

The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or

relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (internal quotation marks and citation omitted). To satisfy this due process protection, the plaintiff must show that the defendant has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Boschetto v. Hansing*, 539 F.3d 1011, 1015–16 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## III.    Venue

A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where the action might have been brought[.]" The purpose of 28 U.S.C. § 1404(a) is to "prevent the waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense[.]" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal citation and quotation marks omitted).

A motion to transfer lies within the broad discretion of the district court and must be determined on a case-by-case basis. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). However, the burden is on the moving party to demonstrate that the balance of conveniences favoring the transfer is high. The defendant must make "a clear showing of facts which . . . establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).

Courts employ a two-step analysis when determining whether transfer is proper. First, a court must ask "whether the transferee district was one in which the action might have been

brought by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960). Second, if the moving party has made this threshold showing, courts may consider "individualized, case-by-case consideration[s] of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).

"When ruling on motions to transfer based on § 1404(a), the court may consider undisputed facts outside of the pleadings." *Palmer Events, LLC v. Hyundai Hope on Wheels*, No. 3:15-CV-02223-PK, 2016 WL 1179857, at *1 (D. Or. Feb. 26, 2016), *F&R adopted,* No. 3:15-CV-02223-PK, 2016 WL 1181679 (D. Or. Mar. 25, 2016); *accord Samson Tug & Barge Co. v. Koziol,* 869 F.Supp.2d 1001, 1015 (D. Alaska 2012) (citing *Gherebi v. Bush,* 352 F.3d 1278, 1302 (9th Cir. 2003)).

## DISCUSSION

Plaintiff brings three claims against Defendant: (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) unlawful trade practices in violation of O.R.S. 646.608; and (3) breach of contract. Defendant moves to dismiss all of Plaintiff's claims for lack of personal jurisdiction. Alternatively, Defendant moves to transfer venue. Additionally, Defendant moves to dismiss Plaintiff's Claims 1 and 2 for failure to state a claim.

The Court finds that Plaintiff's Claims 1 and 2 should be dismissed for failure to state a claim and, thus, the analysis below addresses those claims first. As to Plaintiff's Claim 3, this Court has personal jurisdiction over the claim and declines Defendant's alternative motion to transfer venue.

///

## I.    Motion to Dismiss Claims 1 and 2 for Failure to State a Claim

Defendant moves to dismiss Plaintiff's false advertising claims, Claims 1 and 2, for failure to state a claim. The Court grants Defendant's motion and, because amendment would be futile, dismisses the claims with prejudice.

### A.    Claim 1—Lanham Act

Plaintiff's first claim alleges that Defendant engaged in false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff lacks Lanham Act standing to bring its claim because Plaintiff is not within the zone of interests protected by the statute and there is no proximate causation between Plaintiff's alleged injury and the alleged statutory violation. Thus, the Court dismisses Plaintiff's claim.

The Supreme Court has established a two-part test to determine whether a plaintiff can bring a cause of action under the Lanham Act. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388-89 (2014). First, the Court must determine whether the plaintiff comes within the "zone of interests"; that is, whether the plaintiff has a cause of action under the substantive statute. *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1120–22 (9th Cir. 2015). The *Lexmark* court looked to the statement of the Lanham Act's purposes and observed "the Act's goal of protecting persons engaged in commerce within the control of Congress against unfair competition," and of redressing "injuries to business reputation and present and future sales." *Lexmark*, 134 S. Ct. at 1389-90 (alterations and internal quotation marks omitted). It thus held that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales" as opposed to an allegation that a consumer or business was misled into purchasing disappointing or inferior products. *Id.* at 1390.

The second requirement to bring suit for false advertising under Section 1125(a) of the Lanham Act is a "proximate cause requirement." *Id.* The Court asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* "In the context of the Lanham Act's prohibition on false advertising and unfair competition, the Court held 'that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.'" *Id.* at 1391.

Defendant argues that Plaintiff's claim does not fall within the zone of interests of the Lanham Act because Plaintiff fails to allege an injury to a commercial interest in reputation or sales. Plaintiff responds that its allegations of commercial injury fit squarely within the zone of interests of Section 1125(a).

Plaintiff alleges that Defendant copied technology that it knew Plaintiff exclusively licensed, owned, and had been using since 2011. Compl. ¶ 6, 24. In addition, Plaintiff alleges that Defendant knowingly made false statements in advertising the technology's ability to detect levels of oxidative stress or free radicals. *Id.* at ¶ 27. Thus, according to Plaintiff, its claim is within the Lanham Act's zone of interests because Defendant made knowing misrepresentations in the advertisement of a product that competes with the technology used by Pulse. Plaintiff alleges that it has been damaged by Defendant's false advertising "in an amount not less than $500,000." Compl. ¶ 29.

However, Plaintiff fails to allege any injury to a commercial interest in reputation or sales. Plaintiff argues that "ABI's advertisement serves to misguide the same market and consumer base that Pulse targets with its technology" and cites *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 946 (S.D. Cal. 2016) in support of its argument

that its allegations suffice to state a claim. Plaintiff is correct that both this case and *Obesity Research* dealt with situations in which a defendant's allegedly false representations about its product misled the same customers targeted by the plaintiff. However, in *Obesity Research*, the plaintiff expressly alleged it had been injured in its ability to sell its product because the defendant was selling a sub-standard product and passing it off as the superior product sold by the plaintiff. 165 F. Supp. 3d. at 947. Here, in contrast, Plaintiff does not allege any injury.

Plaintiff's reliance on *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014), is similarly misplaced. POM did not merely claim, as Plaintiff does, that its competitor deceptively marketed a product to consumers. Instead, POM alleged that the misleading advertisements caused it to lose sales. *POM Wonderful,* 134 S. Ct. at 2235. Such an allegation of an injury to a commercial interest in reputation or sales is lacking in Plaintiff's complaint.

Cases from other circuits confirm that Plaintiff must allege an injury to its reputation or sales in order to state a claim. In *Belmora LLC v. Bayer Consumer Care AG,* the plaintiff's claim fell within the Lanham Act's zone of interests because it alleged that it had lost sales revenue due to the defendant's deception of consumers, distributors, and vendors. 819 F.3d 697, 711 (4th Cir. 2016). In contrast, in *Global Tech LED, LLC v. Hilumz Int'l Corp.,* the district court dismissed the plaintiff's Lanham Act claim because nothing in the pleading indicated that the plaintiff had ever been injured. No. 2:15-CV-553-FTM-29CM, 2016 WL 3059390, at *3 (M.D. Fla. May 31, 2016) ("Neither an anticompetitive purpose nor consumer deception establishes injury."); *see also Die-Mension Corp. v. Dun & Bradstreet Credibility Corp.*, No. C14-855 TSZ, 2015 WL 5307472, at *4 (W.D. Wash. Sept. 10, 2015) (plaintiff not within Lanham Act's zone of interests because there was no allegation of harm to reputation or diminished sales).

At oral argument, Plaintiff stressed that it could allege an injury based on harm to future sales. Plaintiff submits the declaration of Chris Marsh, Plaintiff's President and CEO. Marsh Decl. ECF 28. Mr. Marsh attests that Plaintiff "has spent more than $20,000,000 developing its Revelar product since the inception of the company and has filed numerous patent applications on its proprietary technology." *Id.* at ¶ 6. Mr. Marsh declares that "Pulse will be the first company to successfully develop and sell such a product to physician and other end consumers." *Id.* According to Mr. Marsh, "Pulse has recently completed the most current prototype of its Revelar product and will be selling it first in Europe and then in the United States beginning in the second quarter of 2017." *Id.* at ¶ 7. Plaintiff argues that, by the time Plaintiff introduces its product, the market will be spoiled because of Defendant's false advertising. Thus, according to Plaintiff, it is presently being harmed because of the effect Defendant will have on Plaintiff's future sales.

However, contrary to Plaintiff's assertions, its pleadings do not establish Lanham Act standing based on potential injury to future commercial activity because any such injury in this case is purely speculative. Cases from other districts issued post-*Lexmark* illustrate the reasoning behind this conclusion.

In one case, Ted Martin, a world-record holder of consecutive footbag[1] kicks, brought a Lanham Act claim against Wendy's, a fast food restaurant, for running a promotion in which it used Martin's identity. *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925 (N.D. Ill. 2016). Martin alleged an injury to his future business interest in the sale and distribution of a forthcoming footbag product that he was helping to develop and would be paid to endorse. *Id.* at 932. The Court found that Martin was not in the footbag business yet and, thus, lacked Lanham Act

---

[1] A footbag is a popular toy also known by a common brand name, Hacky Sack. *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 927 (N.D. Ill. 2016).

standing because any potential injury to future commercial activity was purely speculative. *Id.* at 933. Therefore, the court dismissed Martin's claim to the extent it relied on an injury to Martin's future business venture. *Id.*

In a similar case, a district court held that a company that had the permits, equipment and facilities necessary for bottled water operations, but had not yet begun operations, did not have standing to bring Lanham Act claims against an established bottled water company. *Maine Springs, LLC v. Nestlé Waters N. Am., Inc.*, No. 2:14–CV–00321–GZS, 2015 WL 1241571, at *6 (D. Me. Mar. 18, 2015). The court noted that the plaintiff company did not allege that it had ever "marketed any bottled water or that it [was] prepared to sell bottled water at [that] time." *Id.* The defendant bottled water company's allegedly false advertising could not have harmed the plaintiff company by diverting any customers because the plaintiff company had not yet begun to "offer bottled water" to anyone. *Id.* The court dismissed the plaintiff's Lanham Act claim. *Id.* at *7.

As in *Martin* and *Maine Springs*, Plaintiff offers no evidence that it is currently marketing or selling its product. Mr. Marsh's declaration that Plaintiff "will be selling" its Revelar product this year does not suffice to establish Lanham Act standing. This Court recognizes that the Ninth Circuit does not always require actual evidence of injury to state a Lanham Act claim because it has "generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 615 (9th Cir. 2016) (citing *TrafficSchool.com,* 653 F.3d at 826). However, Plaintiff does not cite, and this Court does not find, any case where a court makes such a presumption in the absence of evidence that the parties are competitors and the plaintiff has already entered the market.

Finally, Plaintiff notes that, in addition to monetary damages, it also seeks injunctive relief. Plaintiff argues that even if damages are not sufficiently alleged, Plaintiff's right to injunctive relief is proper. *See, e.g., Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("a competitor need not prove injury when suing to enjoin conduct that violates [the Lanham Act]"); *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) ("[B]ecause of the possibility that a competitor may suffer future injury, as well as the additional rationale underlying section 43(a)—consumer protection—a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)."); *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1181 (D. Or. 2008) (same), *aff'd*, 324 F. App'x 921 (Fed. Cir. 2009). However, the problem with Plaintiff's pleadings is not that damages are insufficiently alleged or that Plaintiff cannot prove its injury at this point. The problem is that any allegation of any injury is too speculative to support a Lanham Act claim because Plaintiff has not entered the market. In other words, Plaintiff would be unable to show a likelihood of irreparable harm. Thus, the cases addressing injunctive relief in a Lanham Act claim in which the plaintiffs had already entered the market are inapposite.

Because Plaintiff fails to allege any injury that would place its claim within the Lanham Act's zone of interests, it follows that Plaintiff is also unable to satisfy the second *Lexmark* factor, proximate cause. *See, e.g.*, *Lexmark*, 134 S. Ct. at 1392 ("a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation"); *Muhler Co., Inc. v. Ply Gem Holdings, Inc.*, No. 2:11-CV-862-SB, 2014 WL 12637909, at *3 (D.S.C. Dec. 17, 2014) (declining to find proximate causation factor satisfied when "injury alleged is simply too speculative and remote to be cognizable"); *Ahmed v. Hosting.com*, 28 F. Supp. 3d 82, 91 (D. Mass. 2014) ("A failure to establish standing also prohibits a claim for

proximate causation, as Ahmed provides no means by which to assess whether such damage has occurred, and whether the defendants' actions are the proximate cause of the damage."). Thus, Plaintiff's Lanham Act claim is dismissed in its entirety.

B.  Claim 2—Unlawful Trade Practices Act

Plaintiff's second claim alleges that Defendant made willful false statements about the quality of its goods in its advertising to Oregon consumers, in violation of the Oregon Unlawful Trade Practices Act ("UTPA"), O.R.S. 646.608. Plaintiff lacks standing to pursue its claim because UTPA is limited to consumer actions and Plaintiff is not a consumer of Defendant's products. Thus, this claim is dismissed.

The UTPA states:

> a person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court.

O.R.S. 646.638(1). Oregon courts have found that the UTPA is limited to consumer actions. *Investigators, Inc. v. Harvey,* 53 Or. App. 586, 590, 633 P.2d 6, 8 (1981) ("The [UTPA] applies only to consumer transactions; it does not regulate commercial transactions."); *Denson v. Ron Tonkin Gran Turismo, Inc.,* 279 Or. 85, 90, 566 P.2d 1177, n. 4 (1977) ("In section 3, . . . the language 'unfair methods of competition' had been deleted, since the bill seeks to protect consumers rather than businesses."); *Graham v. Kold Kist Beverage Ice, Inc.*, 43 Or. App. 1037, 1040, 607 P.2d 759, 761 (1979) ("primary purpose of the [UTPA] was to protect consumers, rather than businesses").

Courts in this District, including this Court, have concurred that the UTPA is limited to consumer actions. *See, e.g., Consumer Cellular, Inc. v. ConsumerAffairs.com*, No. 3:15-CV-1908-PK, 2016 WL 3176602, at *9 (D. Or. Feb. 29, 2016), *F&R adopted sub nom. Consumer*

*Cellular, Inc. v. Consumeraffairs.com, Inc.*, No. 3:15-CV-01908-PK, 2016 WL 3176584 (D. Or. June 2, 2016) ("the UTPA leaves little room for the conclusion that a non-consumer may bring a private cause of action under the statute); *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 22 F. Supp. 3d 1126, 1136 (D. Or. 2014) (collecting cases showing at least six judges in this District in agreement); *Accident Care Specialists of Portland, Inc. v. Allstate Fire & Cas. Ins. Co.*, No. 3:11-CV-01033-MO, 2014 WL 2747632, at *5 (D. Or. June 16, 2014) ("Oregon's UTPA covers only consumer transactions."); *L & A Designs v. Xtreme ATVs, Inc.*, No. 03:10-CV-627-HZ, 2012 WL 1532417, at *3 (D. Or. Apr. 30, 2012) ("I am not persuaded by Plaintiffs' arguments and see no reason to depart from the well-reasoned opinions of my colleagues . . . [that] the UTPA is limited to consumer actions.").

Plaintiff acknowledges the extensive line of cases supporting Defendant's position that Plaintiff cannot bring an UTPA claim because it was not a consumer of Defendant's product. Nevertheless, Plaintiff urges this Court to reconsider its past decisions because recent Oregon state court decisions "seem to support the viability of non-consumer UTPA actions." Pl.'s Opp. 37, ECF 27.

However, the cases Plaintiff cites are not persuasive because they do not raise or address the issue of standing. For example, Plaintiff argues that *Pearson v. Philip Morris, Inc.* recognized that a false statement about a competitor's product is actionable under the UTPA. 358 Or. 88, 116 n.17, 361 P.3d 3, 22 (2015). *Pearson* explains that the UTPA has both public and private enforcement provisions. *Id.* at 116 (citing O.R.S. 646.632, 646.638). A public action does not require proof that any consumer has suffered economic loss or other injury. *Id.* The court explains that a public enforcement action under UTPA, including for making a false statement about a competitor's product, may be "the most effective means of protecting consumers from

the practices the statute makes unlawful." *Id.* *Pearson*, however, does not extend the protection of UTPA to non-consumers, as Plaintiff contends.

The other cases Plaintiff relies on are similarly unhelpful. Both *Daniel N. Gordon, PC v. Rosenblum*, 276 Or. App. 797, 370 P.3d 850, *rev. denied sub nom. Gordon v. Rosenblum*, 359 Or. 667, 379 P.3d 522 (2016), and *State ex rel. Rosenblum v. Johnson & Johnson*, 275 Or. App. 23, 362 P.3d 1197, (2015), *rev. denied*, 358 Or. 611, 369 P.3d 386 (2016) were public enforcement cases where no party questioned the State's ability to bring suit under the UTPA.[2] Nor did *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 968 (9th Cir. 1999) suggest that a competitor could establish standing to bring an UTPA claim, in the absence demonstrating that it was also a consumer.

Plaintiff cites one Oregon circuit court opinion that supports Plaintiff's position that competitors, in addition to consumers, may bring an UTPA claim. *See First Pacific Corp. v. American Financial Services, Inc.*, 2002 WL 24407713 (Or. Cir. June 27, 2002) (refusing to follow "federal court's interpretations of [the UTPA]"). However, this Court is not persuaded by a circuit court order from 15 years ago, given the extensive body of more recent caselaw from Oregon appellate courts and this District cited above that confirms that the UTPA covers only consumer transactions. Therefore, Plaintiff's UTPA claim is dismissed.

C.  Leave to Amend

Under Federal Rule of Civil Procedure 15, if a party cannot amend as a matter of course under Rule 15(a)(1), "a party may amend its pleading only with the opposing party's written

---

[2] Plaintiff points to *State ex rel. Rosenblum,* which cites *Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or. 85, 90 n. 4, 566 P.2d 1177 (1997) for the proposition that the UTPA "'is to be interpreted liberally as a protection to consumers' and businesses alike." However, *Denson* does not actually include the words "and businesses alike." *See Denson*, 279 Or. at 90 n. 4. Instead, *Denson* confirms that the policy underpinnings of the UTPA are the protection of consumers as opposed to the protection of businesses, distinguishing the statute from the Uniform Deceptive Trade Practices Act, which emphasizes "identifying business conduct which is in unfair competition with other businesses." *Id.*

consent or with the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* However, the court need not grant leave to amend where the amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysis West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Plaintiff asks for leave to amend its false advertising claims "to cure any deficiencies in its pleading[.]" Pl.'s Opp. Mot. Dismiss 39. However, any amendment would be futile. As to Plaintiff's Lanham Act claim, it is undisputed that, at the time the complaint was filed, Plaintiff was not selling or marketing any product that was impacted by Defendant's alleged false advertising. Thus, Plaintiff lacks standing because any allegation of injury is too speculative. *See Maine Springs*, 2015 WL 1241571, at *1 n.1 (dismissing the plaintiff's Lanham Act with prejudice where the plaintiff lacked standing and did not elaborate on its request for leave to amend except to "request[] the opportunity to file an amended complaint to address any pleading deficiency identified by the Court"). Amendment to Plaintiff's UTPA claim would be futile as well, as it is undisputed that Plaintiff is not a consumer and this Court declines to extend the UTPA to competitors.

## II.     Motion to Dismiss Claim 3 for Lack of Specific Personal Jurisdiction

Defendant moves to dismiss Plaintiff's breach of contract claim for lack of personal jurisdiction. Plaintiff contends that Oregon has specific jurisdiction over Defendant.[3] The Court agrees with Plaintiff.

The plaintiff has the burden of making a prima facie showing of personal jurisdiction. *Boschetto*, 539 F.3d at 1015. "[U]ncontroverted allegations in [plaintiff's] complaint must be

---

[3] Plaintiff concedes that Oregon does not have general jurisdiction over Defendant. *See* Pl.'s Memo. Opp. 5, ECF 27.

taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir. 2002). "[A]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Mulato v. Wells Fargo Bank, N.A.,* 76 F. Supp. 3d 929, 946 (N.D. Cal. 2014).

A court has specific jurisdiction where "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472 (internal quotation marks and citations omitted). The Ninth Circuit uses a three-part test to determine if a party has sufficient minimum contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger*, 374 F.3d at 802).

The plaintiff bears the burden on the first two parts of the test. *Id.* If the plaintiff succeeds, "the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* at 1211–12 (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)). If plaintiff fails to establish either of

the first two parts, the jurisdictional inquiry ends and the case must be dismissed. *Id.* at 1213; *see also Schwarzenegger*, 374 F.3d at 802.

Defendant raises three arguments against the exercise of personal jurisdiction with regard to Plaintiff's breach of contract claim: (1) Defendant did not purposefully avail itself of the privilege of conducting activities within Oregon; (2) Plaintiff's claim does not arise out of any forum-related activities by Defendant; and (3) the exercise of jurisdiction over Defendant is not reasonable.

A. Purposeful Availment

For claims sounding primarily in contract, the Ninth Circuit applies the "purposeful availment" analysis and asks whether a defendant has "purposefully availed himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 1212 (quoting *Schwarzenegger*, 374 F.3d at 802) (alterations omitted). The "[p]urposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988). "In order to have purposefully availed oneself of conducting activities in the forum, the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business with the forum state." *Id.*; see also *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (noting that the relationship with the forum must arise out of contacts that the "defendant *himself*" creates with the forum) (quoting *Burger King*, 471 U.S. at 475) (emphasis in original).

Because a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction," a court must evaluate four factors to determine whether the purposeful availment

prong is met: (1) prior negotiations, (2) contemplated future consequences, (3) the terms of the contract, and (4) the parties' actual course of dealing. *Burger King*, 471 U.S. at 478–79. "Parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)).

### 1. Prior Negotiations

Plaintiff argues that Defendant purposefully availed itself of the privileges of conducting business within Oregon by negotiating the Settlement Agreement in Oregon with Plaintiff, an Oregon company. Plaintiff contends that Defendant visited Plaintiff's facility in Oregon three times throughout the course of the parties' relationship and that the purpose of Defendant's final visit to Oregon was to negotiate the terms of the Settlement Agreement from which Plaintiff's breach of contract claim arises. Marsh Decl. ¶ 11. Defendant denies ever having visited Plaintiff in Oregon for any purpose and contends that the Settlement Agreement was negotiated over the phone and through emails, with Defendant remaining in New Jersey and Plaintiff remaining in Oregon. Akers Decl. ¶¶ 23, 26, 29, 31.

In support of their arguments, the parties submit contradictory declarations. Plaintiff's affiant, Mr. Marsh, submits a declaration in which he states that Defendant's personnel visited Plaintiff's Portland office on March 23, 2011 to negotiate the Settlement Agreement and that, "to the best of [his] recollection," Defendant's President Tom Nicolette and Defendant's co-founder Raymond Akers were present at the meeting. Marsh Decl. ¶ 11. In contrast, Defendant submits the declaration of Mr. Akers. Akers Decl., ECF 33. Mr. Akers declares that he has never been to Plaintiff's offices in Oregon or otherwise met with Plaintiff in Oregon for any purpose. *Id.* at ¶

18. He also submits expense records for Mr. Nicolette that suggest that Mr. Nicolette was not in Oregon on the dates alleged. *Id.* at ¶¶ 12-17.

At this stage in the proceeding, the Court will not weigh the affidavits in order to resolve disputed factual issues. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977) ("Except in those rare cases where the facts alleged in an affidavit are inherently incredible, and can be so characterized solely by a reading of the affidavit, the district judge has no basis for a determination of credibility."). Instead, the Court will take the facts as alleged by Plaintiff. *Id.* at 1287 (accepting the plaintiff's facts as alleged when confronted with conflicting affidavits from the parties as to where the negotiations took place); *see also Dole Food,* 303 F.3d at 1008 ("Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor."); *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [plaintiff]'s version of events for purposes of this appeal."). Furthermore, even disregarding Mr. Marsh's statements as to Mr. Nicollete and Mr. Akers in particular, Mr. Marsh's declaration nevertheless alleges, based on personal knowledge, that Defendant's personnel visited Plaintiff's Portland office to negotiate the Settlement Agreement.

The negotiation of the contract in Oregon militates in favor of a finding of purposeful availment. In *Peterson v. Highland Music*, the Ninth Circuit determined that the specific personal jurisdiction inquiry would be satisfied where the defendant "probably wrote letters and made telephone calls to the [forum state] offices of [plaintiff] in conducting their negotiations, that they quite possibly traveled to [the forum state] as part of these negotiations, and that the licenses may actually have been granted (*i.e.* the contract formed) in [the forum state]." 140 F.3d 1313

(9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (June 15, 1998). The *Peterson* court held that "[c]ontract negotiations are classic examples of the sort of contact that can give rise to in personam jurisdiction." *Id.* The facts presented in *Peterson* strongly resemble those presented in this case, and Plaintiff is correct in arguing that the facts support the first factor of the purposeful availment inquiry.

Similarly, in *Data Disk,* the court affirmed the exercise of specific jurisdiction in California over a defendant corporation incorporated in Florida with its principal place of business in Virginia. 557 F.2d at 1283. The contract at issue was at least partially negotiated in California and the plaintiff executed the contract in California. *Id.* at 1288. The Court determined that, by participating in negotiations in California, the defendant had "purposefully availed itself of the privilege of carrying out activities in that state." *Id.* at 1287. The Court made a finding of specific personal jurisdiction despite the fact that the plaintiff was the party that solicited the contract in Virginia. *Id.* at 1285. Furthermore, the Court found that the defendant visited plaintiff's California plant approximately five times to "discuss progress on the initial and subsequent contracts," and "any necessary changes." *Data Disk.*, 557 F.2d at 1284. The visits and the in-forum negotiations "weigh[ed] strongly in favor of jurisdiction." *Id.* at 1288.

Finding no meaningful way to distinguish this case from *Data Disk*, this Court concludes that the "prior negotiations" factor weighs in favor of a finding of purposeful availment by Defendant.

## 2. Contemplated Future Consequences

Plaintiff asserts that the Settlement Agreement contemplated future forum-centered consequences and was continuous in its nature. Pl.'s Opp. to Mot. to Dismiss 13, ECF 27. Plaintiff argues that the licensing portion of the Assignment, License and Settlement Agreement

is significant to the contemplated future consequences factor. *Id.* at 14. According to Plaintiff, Defendant and Plaintiff were working with Oregon-based companies to test components of the Revelar product (which included component parts made by Defendant), Plaintiff had tested the Revelar product with its Defendant-made components on hundreds of Oregon residents, and Plaintiff had sold the product to Oregon physicians. *Id.*

The Ninth Circuit's decision in *Wyle Labs., Inc. v. Lewis Mach. Co.,* 29 F.3d 638 (9th Cir. 1994), offers guidance as to how to analyze whether the parties' Settlement Agreement contemplated future consequences in Oregon. *Wyle Labs* involved a contract for the sale of a company. *Wyle Labs*, 29 F.3d at *1. The contract contained an indemnity provision under which the buyer (defendant) would assume the liabilities of the purchased company for any product liability claims arising out of events occurring subsequent to the effective date of purchase. *Id.* In determining whether the contract contemplated future forum-centered consequences, the Court held that "the nature of the liability clause contained in the contract at issue subjected the parties to an ongoing relationship. The contract was not a one-time purchase for a particular product, but rather it created a continuing relationship whereby one party agreed to indemnify another party for future losses incurred as a result of [the purchased company's] products." *Id.* at *2.

Similar to the facts of *Wyle Labs*, the parties here did not enter into a contract for the one-time purchase of a particular product. Rather, the parties' Settlement Agreement contemplated further transactions between the parties: Plaintiff must purchase products from Defendant before it could exercise certain rights under the contract. Compl. Ex. 2 ("Settlement Agreement") at 31, 34, ECF 1-2. Thereafter, if Plaintiff wished to continue using the Aldehyde Assay Tubes with its FRED/Revelar product, it had to either purchase them from Defendant, or else pay a royalty fee for each tube manufactured by a third-party manufacturer. *Id.* at 34-35.

Defendant points out that Plaintiff's tangential argument that the Settlement Agreement "ensured [*Plaintiff's*] continued testing, development and exploitation of Revelar" is not a basis for a finding of personal jurisdiction over Defendant. Defendant argues that the Settlement Agreement providing rights to Plaintiff is not evidence of any continuing or future contact or activities *by Defendant* in Oregon. The Court agrees with Defendant that the existence of any rights vested in Plaintiff is not a basis of jurisdiction. Rather, it is the fact that the contract contemplates future contacts between Defendant and Oregon that supports jurisdiction over Defendant. Namely, the contract contemplates Defendant sending more Aldehyde Assay Tubes into Oregon, or else collecting royalty fees from Oregon. This continued relationship between the parties supports a finding of purposeful availment.

### 3. Terms of the Contract

Plaintiff argues that the terms of the Settlement Agreement contemplated the transaction of further business in Oregon. Pl.'s Opp. to Mot. to Dismiss 14. The Settlement Agreement, which incorporated and simultaneously executed the Supply Agreement by reference, provides that Plaintiff "shall not be entitled to exercise its rights under the license set forth in [this agreement] until [Plaintiff] has met the Purchase Threshold under the Supply Agreement[.]" *Id.*; Settlement Agreement, ¶ 7.2. In other words, the contract required Plaintiff to buy a certain number of breath test tubes from Defendant before it could exercise its license rights under the Settlement Agreement. The Settlement Agreement further required that Plaintiff use Defendant as its manufacturer for any additional tubes Plaintiff intended to sell or else pay a continuing royalty fee to Defendant for each tube Plaintiff sold that was manufactured by a third party. *Id.* at ¶ 7.3. Plaintiff argues that these terms contemplate effects on Oregon: products would be sent to Oregon or else royalty fees would be distributed from Oregon.

Defendant argues that the terms militate against a finding of purposeful availment because the Settlement Agreement makes no reference to Oregon as the forum for dispute resolution and, instead, contains a Delaware choice of law provision. Def.'s Mot. to Dismiss at 24, ECF 18. Defendant argues generally that the Settlement Agreement provides no evidence of any continuing or future contact or activities by Defendant in Oregon, and that no aspect of the Settlement Agreement contemplated or required travel by Defendant to Oregon. Def.'s Reply Mem. at 8; Def.'s Mot. to Dismiss at 25.

However, a choice of law provision is not sufficient to defeat jurisdiction. *Marmis v. Sunbelt Sav. Ass'n of Texas*, 889 F.2d 1095, *2 (9th Cir. 1989) (citing *Burger King*, 471 U.S. at 481). Furthermore, the terms of the contract provide for the future manufacture of tubes, as well as a term requiring Plaintiff to purchase such tubes from Defendant. *See* Settlement Agreement, ¶¶ 6, 7.2. These terms refute Defendant's argument that the terms of the contract do not provide for future or continuing contact with Oregon.

In briefing this third factor of the purposeful availment analysis, neither party cites any cases that are particularly instructive on the "terms of the contract" factor. However, in its argument on the preceding factor, Plaintiff cites *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991). The *Roth* court stated that "with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Roth,* 942 F.2d at 621(citing *Burger King*, 471 U.S. at 475). Here, the contract terms are undoubtedly for Defendant's benefit, and were presumably negotiated by Defendant in Oregon. *See* Marsh Decl. ¶ 11. The terms impose upon Plaintiff, an Oregon party, an obligation to purchase from Defendant a number of tubes, if the Plaintiff

wishes to exercise the licensing rights it acquired as part of the Settlement Agreement. By negotiating for and obtaining such a term, Defendant has "reach[ed] out beyond one state and create[d] continuing relationships and obligations with [a] citizen[] of another state." *Roth*, 942 F.2d at 921.

It would be unfair to allow Defendant to travel to another state and establish a four-year-long relationship with an in-state party, culminating in a pair of agreements which foresee further business transactions in the forum state, and yet allow Defendant to wield "the Due Process Clause . . . as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King*, 471 U.S. at 474. As such, the terms of the contract support a finding of purposeful availment by Defendant.

### 4. Parties' Actual Course of Dealing

Plaintiff argues that the parties' course of dealing supports a finding of purposeful availment because the parties' course of dealing spanned a period of four years and consisted of multiple agreements. Pl.'s Opp. to Mot. to Dismiss 15. Plaintiff additionally argues that the multiple agreements between the parties had the effect of promoting the transaction of business within Oregon. Plaintiff alleges that Defendant sold and delivered more than 85,000 breath tube and chemical reagent components to Oregon, and directed countless correspondences to Oregon.

Defendant argues in its Reply that Defendant's sale to Plaintiff of 85,000 breath tube and chemical reagent components which were sent to Oregon in connection with Plaintiff's past development of the Revelar device is "not the sort of affirmative conduct by [Defendant] which supports purposeful availment of the privilege of conducting activities in Oregon vis-à-vis [Plaintiff's] breach of contract claim." Def.'s Reply Mem. at 9. Defendant is essentially arguing that actions taken in connection with the contract that are not directly related to the nature of its

alleged breach ought not to be considered for purposeful availment. Defendant's argument is unconvincing. Defendant does not cite to any legal authority to support its argument that the Court should not examine the entire course of dealing between the parties in relation to the contract when determining whether Defendant has purposefully availed itself of the privileges and protections of Oregon law while doing business in Oregon.

*Walker & Zanger (W. Coast) Ltd. v. Stone Design S.A.*, 4 F. Supp. 2d 931 (C.D. Cal. 1997), *aff'd sub nom. Walker & Zanger (W. Coast) Ltd. v. Stone Design SA*, 142 F.3d 447 (9th Cir. 1998) is on point. In *Walker*, a California District Court found jurisdiction over a French company that had shipped products to, and accepted payment from, a California plaintiff over a period of approximately eight years. 4 F. Supp. 2d at 939. The *Walker* court found that personal jurisdiction over the defendant was reasonable by characterizing the defendant's actions as "affirmative conduct which allows or promotes the transaction of business within the forum state." *Walker & Zanger*, 4 F. Supp. 2d at 939. In applying the test, the court reasoned that "by doing business with a corporation operating in California, [the defendant, a French limestone company,] necessarily availed itself of the protection of California's laws . . . Consequently, the purposeful availment prong is satisfied." *Id.*

Here, Defendant shipped products to Plaintiff in Oregon and accepted payment over the course of the parties' four-year-long relationship. As in *Walker*, such a course of dealing supports a finding of purposeful availment.

In sum, all four factors weigh in favor of finding specific personal jurisdiction over Defendant with regard to Plaintiff's breach of contract claim. Accordingly, the Court finds that Plaintiff has met its burden in establishing that Defendant purposefully availed itself of the privilege of doing business in Oregon, and of the protection of Oregon's laws.

B.  <u>Relation Between the Claim and Defendant's Forum-Related Activities</u>

Defendant argues, without citing any legal support, that because Defendant's alleged breach of contract occurred in New Jersey, the second prong of the specific personal jurisdiction analysis cannot be met. Def.'s Mot. to Dismiss 21. The Court is unconvinced by Defendant's argument.

"To determine whether a claim arises out of forum-related activities, and satisfy the second part of the Ninth Circuit test, courts apply a 'but for' test. Here, the Court must decide whether the plaintiff's claims would have arisen but for the defendants' contacts with [the forum state]." *Walker*, 4 F. Supp. 2d at 939 (internal citations omitted). In *Walker,* the defendant, a French company, breached a contract with a California company under which the defendant was to send the plaintiff a shipment of limestone. "It is clear that but for the contractual negotiations and performance between plaintiff and defendant, plaintiff would have had no action against defendant. Accordingly, this prong of the test is satisfied." *Id.*

Both *Walker* and this case involve long-term contractual relationships between an in-state plaintiff and out-of-state defendant under which defendant shipped products to plaintiff and accepted payment over the course of their years-long relationships. Here, as in *Walker*, "but for the contractual negotiations and performance between plaintiff and defendant plaintiff would have had no action against defendant." *Id.* Plaintiff has met its burden in establishing this prong of the purposeful availment analysis.

C.  <u>Reasonableness of Exercise of Jurisdiction</u>

Under the Ninth Circuit test for exercise of specific personal jurisdiction, once the plaintiff has established a prima facie showing of personal jurisdiction, the burden shifts to the defendant to present a "compelling case" that the exercise of personal jurisdiction would be

unreasonable. In determining whether the exercise of jurisdiction comports with "fair play and substantial justice" and is therefore reasonable, the court weighs seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*CollegeSource*, 653 F.3d at 1079. Defendant did not address all the factors directly, but rather only addressed the burden it would face defending this case in Oregon.

### 1.  Purposeful Interjection

The purposeful interjection analysis involves the same analysis as the purposeful availment prong under *Sinatra*, 854 F.2d 1191, and is therefore redundant. *Roth,* 942 F.2d at 623. Having concluded that Defendant purposefully availed itself of the privilege of conducting activities in Oregon with regard to Plaintiff's contract claim, there is no need to analyze this factor independently as to that claim. *Id.*

### 2.  Burdens on Defendant

Defendant argues its burden to defend this action in Oregon is significant. Defendant lists as its chief burdens the inability to compel attendance of critical non-party witnesses because they lie outside the subpoena power of this Court, as well as having to provide the trial testimony of seven of its New Jersey employees. Def.'s Mot. to Dismiss 26. Defendant also argues that because it "has done little to reach out to the forum state," Defendant's burdens militate against exercising jurisdiction.

Plaintiff argues that it would suffer the same burdens asserted by Defendant should it be required to litigate in New Jersey, and that "this court 'must examine the burden on the defendant in light of the corresponding burden on the plaintiff.'" Pl.'s Opp. to Mot. to Dismiss

24 (citing *Roth*, 942 F.2d at 623). Plaintiff argues additionally that Defendant's burdens are lessened because it has counsel located in Oregon. To support its argument, Plaintiff cites *Ting v. Orbit Commc'n Co.*, 105 F.3d 666 (9th Cir. 1997) (burden favoring plaintiff in light of defendant's contacts with the forum and presence of counsel in the forum) and *Sinatra*, 854 F.2d at 1199 (less burden on defendant where defendant has an agent in the forum). The cases cited by Plaintiff are not factually on point. The briefs indicate that the defendant in *Ting* had already retained counsel in the forum state before litigation ensued, rather than obtaining counsel for the purpose of defending itself in the litigation. Appellant's Opening Brief, Ting v. Orbit Commc'n Co., 105 F.3d 666 (9th Cir. 1997) (No. 95-55838), 1995 WL 17067130 at *7. Similarly, in *Sinatra*, the defendant's in-forum agent predated the litigation. *See Sinatra*, 854 F.2d at 1196, 1199. Plaintiff has not presented any evidence showing that Defendant here had counsel in Oregon prior to this litigation.

While Plaintiff is therefore incorrect in arguing that Defendant's burdens are less than its own, Plaintiff is still correct in arguing that Plaintiff would suffer the same burdens litigating in New Jersey as Defendant would have litigating in Oregon. As such, Defendant has not made a showing of substantial burdens necessary to show that this factor supports a compelling case against the reasonableness of exercising jurisdiction over Defendant.

### 3. Remaining Factors

Defendant makes no argument regarding the remaining factors and, thus, the Court addresses them briefly. As to the extent of conflict with sovereignty of a foreign state, there is no evidence that this litigation would interfere in any way with the sovereignty of New Jersey. This factor therefore supports a finding of reasonableness.

As to the forum state's interest in adjudication, Plaintiff argues this factor weighs in favor of exercise of jurisdiction because Oregon has a substantial interest in adjudicating contract claims that harm one of its residents, and that New Jersey does not have the same interest because Defendant purposefully availed itself of the benefit of doing business in Oregon. Pl.'s Opp. to Mot. to Dismiss 25. Defendant has not alleged that New Jersey has a superseding interest in the litigation. The Court therefore accepts Plaintiff's argument.

In considering the most efficient judicial resolution, this factor largely tracks the burdens analysis. There is no evidence indicating that it would be more efficient to resolve this action in New Jersey rather than Oregon. Certainly it is not so inefficient to resolve the case in Oregon that this factor demands a finding of unreasonableness in the exercise of specific personal jurisdiction. Because it would be equally efficient to resolve this dispute in either forum, this factor is neutral.

The convenience and effectiveness of relief for plaintiff favors a finding of personal jurisdiction. Plaintiff sustained injury in this forum, key witnesses are located in this forum, and documentary evidence relating to Plaintiff's technology are located in this forum as well. *CE Distribution v. New Sensor Corp.* 380 F.3d 1107, 1112 (9th Cir. 2004) ("[l]itigating in one's home forum is obviously most convenient."). As to the availability of an alternate forum, this factor is neutral. Plaintiff could bring this case in New Jersey if it so desired.

4.   Balancing the Seven Factors

Because five of the seven factors support a finding of reasonableness, and two are neutral, Defendant has failed to carry its burden requiring a "compelling case" to be demonstrated against the reasonableness of this Court's exercise of jurisdiction. Accordingly, the third prong of the personal jurisdiction analysis is satisfied.

D. <u>Weighing the Three Prongs</u>

Plaintiff has met its burden of making a prima facie showing of purposeful availment and connection between Defendant's forum-related activities and Plaintiff's contract claim. Because Defendant has failed to present a "compelling case" showing that exercise of personal jurisdiction over it would be unreasonable, all three prongs support a finding of specific personal jurisdiction over Defendant as to Plaintiff's breach of contract claim.

## III.    Venue

Defendant moves to transfer venue to the District of New Jersey. It is undisputed that this case could have been brought in that district; therefore, the Court considers the issues of convenience and fairness.

The Ninth Circuit has identified a number of public and private interest factors that a district court may consider. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1180 (9th Cir. 2006) ("Even when an adequate alternative forum exists, we will not disturb the plaintiff's original choice of forum unless the private interest and the public interest factors strongly favor dismissal.") (internal quotation marks and citation omitted). This Court may consider:

> (1) the plaintiff's choice of forum, (2) the parties' contacts with the forum, (3) convenience to the parties, (4) convenience to the witnesses, (5) availability of compulsory process for non-party witnesses, (6) ease of access to evidence, (7) differences in the costs of litigation in the two forums, (8) familiarity of each forum with the applicable law, (9) local interest in the controversy, and (10) the relative court congestion and time of trial in each forum.

*Jones*, 211 F.3d at 498 (citing *Stewart*, 487 U.S. at 29–31); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*, No. 3:15-CV-00064-HZ, 2015 WL 3986148, at *5 (D. Or. June 29, 2015).

A.  Plaintiff's choice of forum and parties' contacts with the forum

A plaintiff's choice of forum is generally entitled to deference in deciding a motion to transfer venue. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum."); *see also Decker Coal,* 805 F.2d at 843 ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."); *Adidas Am., Inc. v. Cougar Sport, Inc.*, No. 3:15-CV-01856-SI, 2016 WL 1054581, at *10 (D. Or. Mar. 14, 2016) (holding that because adidas had its United States headquarters and principal place of business in Oregon, adidas's choice of forum was given "great weight"). In particular, when a plaintiff resides in the chosen forum, courts give substantial deference to the plaintiff's forum selection. *Piper Aircraft*, 454 U.S. at 255 ("[A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum.").

Defendant argues that Plaintiff's choice of forum is entitled to less than deference than the Court would ordinarily award because the operative facts of Plaintiff's claims did not occur in Oregon. As already discussed, Plaintiff's evidence refutes this argument. ABI personnel visited Plaintiff's offices in Portland, Oregon on March 23, 2011 to negotiate the terms of the April 8, 2011 Settlement Agreement. Marsh Decl., ECF 28. Plaintiff did not engage in any negotiations in New Jersey. *Id.* at ¶ 10.[4] Thus, enough of the operative facts of the breach of contract claim occurred in Oregon, such that this factor weighs against transfer.

///

---

[4] The Court recognizes that Defendant submits a contradictory declaration. *See* Akers Decl., ECF 19. However, for the reasons explained in the personal jurisdiction analysis above, the Court takes Plaintiff's alleged facts as true at this stage of the proceeding.

B.  Remaining factors

The remaining factors are either neutral or weigh so slightly in one party's favor as to not be significant in this Court's analysis.

1.  Convenience to the parties and witnesses

Each party argues that its preferred venue would be more convenient, primarily due to the location of its witnesses. Convenience of witnesses is often the most important factor in determining whether or not to transfer a case. *Partney Const., Inc. v. Ducks Unlimited, Inc.*, No. CIV. 08-574-SU, 2008 WL 4838849, at *3 (D. Or. Nov. 3, 2008) (citation omitted); *see also Cougar Sport*, 2016 WL 1054581, at *11 ("The convenience of witnesses, particularly nonparty witnesses important to the resolution of the case, is often cited as the most significant factor in a ruling on a motion to transfer.") (citing 15 Charles Alan Wright and Arthur R. Miller, *Federal Practice & Procedure* § 3851 (4th ed. 2015)). The "convenience of the witnesses" factor takes into account the convenience to both party and non-party witnesses; however, courts give more consideration to non-party witnesses, as opposed to witnesses who are employees of a party to the litigation. *Id.* The court considers not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony, as it relates to the issues in the case. *Id.*

Defendant has identified seven non-party witnesses in this case, each located outside of the subpoena power of this Court and within the subpoena power of the U.S. District Courthouse in Camden, New Jersey.[5] Akers Decl. ¶¶ 33-37. Dr. Sobel would testify to the results of a study he undertook regarding the reproducibility of results for OxiCheck. *Id.* at ¶ 33. Former CEO of Defendant, David Urman, would testify to refute allegations that Defendant breached the

---

[5] Rule 45(c)(1)(A) of the Federal Rules of Civil Procedure provides that a subpoena may command a person to attend a trial, hearing, or deposition within 100 miles of where the person resides, is employed, or regularly transacts business in person.

Settlement Agreement and would provide context as to the settlement events alleged in the complaint. *Id.* at ¶ 34. Mr. Nicolette, the former CEO of Defendant, was Defendant's primary negotiator of the Settlement Agreement and would provide testimony on the agreement. *Id.* at ¶ 35. Three employees of K-Tron, a third-party manufacturer of Defendant's products, would provide testimony regarding the work done in developing and manufacturing a device for Plaintiff. *Id.* at ¶ 36. Ms. Garner would testify regarding Defendant's compliance with FDA requirements concerning the Oxi-Check Rapid Breath Test for Oxidative Stress. *Id.* at ¶ 37. Defendant argues that it would be prejudicial to Defendant to be required to proceed to trial in Oregon without the live trial testimony of these non-party witnesses. In addition, Defendant identifies seven employees who will testify. *Id.* at ¶ 32.

Plaintiff identifies three non-party witnesses who will testify and who are within the subpoena power of the U.S. District Court of Oregon. Marsh Decl. ¶ 21. Mr. Garbutt will testify regarding testing that was done on the early version of Revelar products. *Id.* Mr. Sage has knowledge concerning the mechanical engineering that was done for the Revelar device and allegedly copied by Defendant in its Vivo device. *Id.* Mr. Murray will testify regarding the failure of Defendant's chemical reagents to detect aldehydes. *Id.* In addition, Plaintiff identifies six of its employees who reside in this District and would be called to testify. *Id.* at ¶ 20.

Both parties attack the necessity of the testimony of non-party witnesses identified by the opposing party. Plaintiff contends that Ms. Garner's testimony is irrelevant because Plaintiff's claims do not involve FDA regulatory issues. Marsh Decl. ¶ 22. In addition, Plaintiff contends that Mr. Urman has agreed to travel to Portland to testify, if necessary. *Id.* Defendant challenges the relevance of the testimony of all of Plaintiff's non-party witnesses. Def.'s Reply 11, ECF 32.

The Court concludes that both parties identify the substantive testimony of proposed witnesses with specificity and persuasively argue that their witnesses would be inconvenienced if this case is heard in the other's preferred forum. While Defendant identifies more non-party witnesses who fall outside of this District's subpoena power, the difference in number between each party's proposed witnesses is not significant enough to weigh in either party's favor. *See, e.g.*, *Partney Const., Inc. v. Ducks Unlimited, Inc.*, No. CIV. 08-574-SU, 2008 WL 4838849, at *3 (D. Or. Nov. 3, 2008) (explaining that courts consider more than just the number of witnesses located in the respective districts). Thus, the location of the witnesses does not weigh in favor of transfer. *See Buckman v. Quantum Energy Partners IV, LP*, No. 07-CV-1471-BR, 2008 WL 2235234, at *10 (D. Or. May 29, 2008), *on reh'g*, No. 07-CV-1471-BR, 2009 WL 4825914 (D. Or. Dec. 8, 2009) ("Merely shifting rather than eliminating the inconvenience is not a grounds for transfer of venue.") (citing *Decker Coal*, 805 F.2d at 843).

2.  Cost of litigation

The factor of the cost of litigation does not weigh in either party's favor, as each party will bear a greater cost if the case does not proceed in its preferred forum. *See, e.g., Buckman*, 2008 WL 2235234 at *11 (declining to transfer where one party "merely seek[s] to shift the financial burden" to the other).

3.  Local interest in the controversy

The "local interest in the controversy" factor is neutral because both parties are headquartered in their preferred forum and both contribute to their respective local economies as employers.

///

4. Familiarity of each forum with the applicable law

The parties agree that a federal judge in Oregon or New Jersey would be equally equipped to interpret the applicable law. Thus, this factor is neutral.

5. Ease of access to evidence

The ease of access to evidence only slightly weighs in Defendant's favor. Defendant argues that all of its books, records, and employees are located in New Jersey and, thus, this factor favors transfer of venue. Plaintiff responds that, in this age of electronic filing, email, and other technological advances, transporting documents generally does not create a burden. Pl.'s Br. 31, ECF 27 (citing *Eason*, 2016 WL 1029482, at *4). Generally, the Court agrees with Plaintiff and declines to give this factor much weight in light of technological advances in document storage and retrieval. However, because Plaintiff makes no argument as to any reason this factor weighs in its favor, the Court finds that it slightly favors transfer. *See In re TS Tech USA Corp.*, 551 F.3d 1315, 1321 (Fed. Cir. 2008) (instructing district courts not to render this factor superfluous in light of technological developments).

B. Summary

Balancing all of the factors above, most of which are neutral, the Court finds that Defendant has failed to make a showing that would overcome the deference awarded to Plaintiff's choice to litigate this matter in its home forum. *See, e.g.*, *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*, No. 3:15-CV-00064-HZ, 2015 WL 3986148, at *6 (D. Or. June 29, 2015) (declining to transfer venue where the factor analysis "essentially stalemates").


///

**CONCLUSION**

Defendant's motion to dismiss [18] is granted in part. Plaintiff's Claims 1 and 2 are dismissed with prejudice. As to Plaintiff's Claim 3, Defendant's motion to dismiss or transfer venue is denied. Within 10 days of the filing of Defendant's answer, the parties are directed to jointly contact the Courtroom Deputy to set a scheduling conference.

IT IS SO ORDERED.

Dated this _____ day of _____, 2017.


_____
MARCO A. HERNÁNDEZ
United States District Judge