IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


PULSE HEALTH LLC, an Oregon
Limited Liability Company,

No. 3:16-cv-01919-HZ

        Plaintiff,

OPINION & ORDER

    v.

AKERS BIOSCIENCES, INC., a
New Jersey Corporation,

        Defendant.


David H. Angeli
Kristen L. Tranetzki
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204

Adam K. Yowell
Michael D. Rounds
Sherli Frank
BROWNSTEIN HYATT FARBER SHRECK, LLP
5371 Kietzke Lane
Reno, Nevada 89511

      Attorneys for Plaintiff

Jennifer Wagner
STOLL STOLL BERNE LOKTING & SCHLACHTER PC
209 SW Oak Street, Suite 500
Portland, OR 97204

Anthony J. DiMarino
Emmett S. Collazo
A.J. DIMARINO, P.C.
41 Grove Street
Haddonfield, NJ 08033

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Pulse Health brings this breach of contract action against Defendant Akers

Biosciences, Inc. Defendant moves for summary judgment on Plaintiff's claim for breach of

contract. For the reasons that follow, the Court denies Defendant's motion.

## BACKGROUND

      Plaintiff Pulse Health LLC is an Oregon Limited Liability Company. Am. Compl. ¶ 1,

ECF 40. In 2008, Plaintiff was developing the Free Radical Enzymatic Device ("FRED"), which

sought to detect the range of aldehydes in human breath. DiMarino Decl. Ex. F (Marsh Dep.)

12:24–14:3, ECF 58-6. Plaintiff also developed a device called "Revelar," which also sought to

detect aldehydes in human breath. *Id.* at 14:24–15:8, 17:12–24. Approximately 4.5 to 5 million

Revelar devices were sold in the United States for a period of six to nine months in 2010 and

2011, but Plaintiff removed the product from the market due to consistency issues. Rounds Decl.

Marsh Dep. 30:17–32:10, ECF 64; DiMarino Decl. Ex. J (Marsh 2016 Decl.) ¶ 16, ECF 58-10.

      Defendant Akers Biosciences, Inc., is a New Jersey corporation. Am. Compl. ¶ 2.

Defendant is in the business of developing and selling "diagnostic products and devices that are

designed to deliver various health information test results with laboratory-level accuracy, but

with cheaper and faster results." Def. Mot. Summ. J. ("Def. Mot.") 4, ECF 57 (citing DiMarino

Decl. Ex. H (Akers Decl.) ¶¶ 5, ECF 58–8). Defendant's products include the Vivo and OxiChek products. DiMarino Decl. Ex. I (Akers Dep.) at 106:8–19, ECF 58-9; Am. Compl. ¶¶ 19, 21.

## I. The Parties' Agreements

The parties entered into a Technology and Development Agreement ("TD Agreement") around September 14, 2007, and a Technology Transfer Agreement ("TT Agreement") around December 31, 2008. Am. Compl. Exs. 1, 2. According to Plaintiff, the purpose of the TD agreement was for Defendant to "design and develop 'New Versions' of its existing free radical test product in order for it to be used in combination with [Plaintiff's] hand-held FRED product." *Id.* at ¶ 11, Ex. 1 at 1. The TT Agreement terminated the TD Agreement and required Plaintiff to pay Defendant a sum of $3,000,000. *Id.* at Ex. 2 ¶ 4. In exchange for this payment, Defendant agreed to "complete research, development, and testing for the 'Free Radical Technology'" and "assigned all intellectual property rights of any kind in the 'Assigned Technology' to [Plaintiff]." *Id.* at ¶ 13 (citing TT Agreement at ¶¶ 1.5, 2.1, and Schedules 1.5 and 2.5). "Assigned Technology" included "all Technology now or hereafter owned or controlled by [Defendant] which relates in any way to non-invasive exhaled breath testing, including without limitation the Technology described in Schedule 1.5 . . . ." *Id.* at Ex. 2 ¶ 1.5. Schedule 1.5, in turn, describes the Assigned Technology as: "(a) The Free Radical Breath Condensate Technology . . . ." and (2) "all breath tubes, reagents, measurement devices, and all methods pertaining to the design, formulation and manufacturing of same, together with all . . . know-how . . . pertaining to the same." *Id.* at Ex. 2 at 18. According to Plaintiff, Defendant unsuccessfully attempted to develop a reagent to test for aldehydes under these agreements. DiMarino Ex. J (Marsh 2016 Decl.) ¶ 9.

On April 8, 2011, the parties entered into an Assignment, License and Settlement Agreement ("Settlement Agreement") that terminated all prior agreements. Am. Compl. Ex. 3 at

§ 11.1. The Settlement Agreement transferred to Defendant all of its rights in the Assigned

Technology and, in exchange, relieved Plaintiff of its remaining payment obligations under the

TT agreement: "In consideration of the assignment set forth in Section 2.1, ABI agrees to release

and forever discharge Pulse from any obligation to pay the remaining balance of $2.325 million

owing to ABI under the Technology Transfer Agreement." *Id.* at § 2.2.  Particularly relevant to

this cause of action, the Settlement Agreement also gave Plaintiff:

> [A]n exclusive, worldwide, transferable, sublicensable, fully paid-up, perpetual
> license under the Assigned Technology and ABI Patents to: (a) make, have, made,
> use, sell, offer for sale, import and otherwise distribute and dispose of products
> that use or incorporate any Assigned Technology in the field of Aldehyde Tests as
> defined in Section 1.3; and (b) to practice any methods, processes and procedures
> included within, and otherwise commercially exploit, such Technology in the
> field of Aldehyde Tests as defined in Section 1.3.

*Id.* at § 3.4.  Defendant also "acknowledge[d] and agree[d] that it has no right or license to use

any Assigned Technology or to practice the ABI Patents in the field of Aldehyde Breath Tests."

*Id.* at § 3.4.2.  The Settlement Agreement defines "Aldehyde Tests" as:

> [T]ests that qualitatively or quantitatively detect the presence of aldehydes in
> human exhaled breath or breath condensate for detection of free radical damage,
> cell damage or cell death, oxidative stress (including weight loss and BMI
> correlations), and interventions to mitigate oxidative stress (including diet,
> exercise, supplementation and stress relief). For avoidance of doubt, Aldehyde
> Tests do not include Alcohol Breath tests, Ketone Breath Tests, or Pulmo Breath
> Tests.

*Id.* at § 1.3. The Settlement Agreement defines "Assigned Technology" as "all Technology

assigned by ABI to Pulse under the Technology Transfer Agreement." *Id.* at § 1.5.

Defendant also agreed that Plaintiff "has the unlimited right to use and otherwise

commercially exploit all Technology developed by [Plaintiff], including any modifications,

improvements, or additions to the Assigned Technology, and that [Defendant] has no rights with

respect to such Technology." *Id.* at § 5. Technology includes:

inventions, processes, designs, copyrights, trade secrets, know-how, trademarks, domain names, development, improvements, tests, software, and intellectual property rights of any nature whatsoever, including without limitation any applications or registrations of the foregoing, any rights arising from registration of any of the foregoing, and any right to sue for past or future infringement of the foregoing.

*Id.* at § 1.7.

## II.     Defendant's Vivo and OxiChek Devices

Between 2012 and 2015, Defendant developed its "Vivo" and "OxiChek" devices. Vivo is a "reagent and reader" created by Defendant for two of Plaintiff's former employees. DiMarino Decl. Ex J (Marsh 2016 Decl.) ¶ 17; Rounds Decl. Akers Dep. 94:25–95:13, 97:23–98:4. Defendant's witnesses admit that the "Vivo reagent measured aldehydes in exhaled breath." Rounds Decl. Akers Dep. 101:9–25; *id.* at Feldman Dep. 17:11–14. Defendant sold approximately 25 Vivo products to Plaintiff's former employees in 2012, *id.* at Akers Dep. 101:9–25, and sold the remaining inventory of Vivo reagents to a distributor in India in 2015 for $55,000, *id.* at Akers Dep.140:21–141:7; *id.* at Exs. 8, 9 at 1.

The parties disagree on whether the purpose of the OxiChek device is to use the Assigned Technology to test for aldehydes exhaled in human breath. The device consists of a cartridge that the user breathes into and a reader that receives the cartridge to provide health data to the user. DiMarino Decl. Ex. N at 3, ECF 58-14. The reagent used in the test is contained in a small glass ampule inside the cartridge that the user breaks to release the reagent. *Id.* Defendant's BreathScan Lync Reader "analyzes the reagent in the cartridge and sends the results to the Akers Wellness App." Def. Mot. 6.

Defendant contends that OxiChek tests for "indicators of oxidative stress in exhaled breath—specifically hydrogen peroxide and superoxide." *Id.* at 6 (citing Ex. N at 2 (OxiChek product insert)). Defendant alleges that Plaintiff "has no evidence that ABI sells a product that

tests for aldehydes in human breath" and that Plaintiff's "witnesses and documents confirm that [Plaintiff's] own testing of [Defendant's] OxiChek product show that OxiChek does not test for aldehydes in exhaled human breath. *Id.* at 9 (emphasis in original) (citing DiMarino Decl. Ex. F (Marsh Dep.) 97:14–98:13, ECF 58-6; *id.* at Ex. L at 26, ECF 58-12). Defendant argues that its marketing materials that state otherwise were a mistake that was corrected after Defendant discovered the error. DiMarino Decl. Ex. I (Akers Dep.) 120:5–133:18.

Plaintiff, by contrast, alleges that the OxiChek and FRED/Revelar reagents have chemically identical core compounds. *Compare* Hahon Decl. Ex. 5 at 1 and Ex. 6 at 1 *with* Rounds Decl. Ex. 10 at 1 and Ex. 11 at 4. Both reagents use a "Schiff test." Rounds Decl. Ramanujachary Dep. 33:10–35.25; *id.* at Akers Dep. 35:5–36:18. Plaintiff admits that there are some minor chemical differences between the OxiChek and FRED/Revelar reagents. *Compare* Hahon Decl. Ex. 5 at 1 and Ex. 6 at 1 *with* Rounds Decl. Ex. 10 at 1 and Ex. 11 at 4. Defendant also repeatedly tested the OxiChek device to determine whether it could test aldehydes, Rounds Decl. Exs.12, 13; *id.* at Cougan Dep. 30:25–31:5, 37:14–19, and the initial product insert, an early press release, a power point presentation to a future distributor, and sell sheets all market the OxiChek device as capable of measuring aldehydes in addition to oxides and superoxides. *Id.* at Exs. 14–19. Plaintiff emphasizes that only one test was conducted to determine whether OxiChek could accurately measure hydrogen peroxide, and it was conducted after the litigation was filed 2016. *Id.* at Ex. 12 at 26–27; *id.* at Cougan Dep. 58:8–23. Plaintiff also suggests that the Defendant and its expert disagree on how the reagent causes a reaction with hydrogen peroxide. *Compare* DiMarino Decl. Ex. D ¶ 5, ECF 58-4 *with* Rounds Decl. Ex. 21 ¶ 28.

The parties also disagree on whether Defendant's OxiChek device and Plaintiff's FRED/Revelar devices contain Plaintiff's Technology as defined in the agreement. Both parties

agree that these devices are colorimeters, Def. Mot. 6, but Defendant contends that this is technology that has been available for over a century and was not used in any new or innovative way by Plaintiff's FRED/Revelar products, DiMarino Decl. Ex. D (Def Resp. Pl. Interrog. No. 10) at 8. Defendant admits some "generic" similarities between the devices. Def. Mot. 10–11 (citing DiMarino Decl. Ex. M (Carlsen Dep.) 21:1–23:6, ECF 58-13). Defendant also contends that the components of the two devices are different in key ways: (1) the circuit boards and schematic design are different; (2) the optical chamber, LED, diodes, switches, and gates are different; and (3) the OxiChek provides a readout to a mobile device via Bluetooth rather than a LCD readout. DiMarino Decl. Ex. D (Def. Resp. Pl. Interrog. 10) at 8. Plaintiff's witness also testified that the devices do not have "identical components, manufacturer kind of thing" and had breath cartridges that appear different "in appearance," different light sensors, and "different microcontrollers" that "could be similar," though he could not know for sure without the program code from the OxiChek." DiMarino Decl. Ex. M (Carlsen Dep.) 20:2–21:7, 25:5–12, 29:9–30:22.

Plaintiff contends that these devices contain the same technology: both use (1) an LED to illuminate the reagent, (2) an optical sensor to read the light of the reagent, (3) a switch to activate the reader; and (4) electronic components called NAND gates. *Id.* at 20:2–21:22, 22:4–23:12; Rounds Decl. Daniel Dep. 31:2–33:14, 36:15–37:17, 56:5–12, 67:6–12. The same electronics designer also designed the electronics and circuit board for both devices. Rounds Decl. Daniel Dep. 21:5–23:14; *id.* at Akers Dep. 152:2–153:7.

## III.    Procedural History

Plaintiff filed this case on September 30, 2016, bringing three claims against Defendant: (1) False advertising under the Lanham Act; (2) Unlawful Trade Practices under Or. Rev. Stat.

646.608; and (3) Breach of Contract. Compl., ECF 1. Defendant moved to transfer venue and dismiss this case for lack of personal jurisdiction and failure to state a claim under Federal Rule of Civil Procedure 12. Def. Mot. Dismiss, ECF 18. The Court granted Defendant's motion in part, finding that Plaintiff could not state a claim under the Lanham Act or Or. Rev. Stat. 646.608. Opinion & Order, ECF 36. The Court denied Defendant's motion to transfer venue and determined that it has personal jurisdiction over the Defendant. Opinion & Order, ECF 36. The Court, accordingly, allowed Plaintiff's breach of contract claim to proceed. *Id.* Plaintiff filed an Amended Complaint on April 28, 2017, alleging only breach of contract. Am. Compl., ECF 40. Defendant now moves for summary judgment and dismissal of Plaintiff's Amended Complaint. Def. Mot. 1. Oral Argument on Defendant's motion was held on May 29, 2018.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Plaintiff brings this breach of contract action against Defendant alleging that Defendant breached the terms of the parties' Settlement Agreement. Delaware law governs this contract dispute. "When a federal court sitting in diversity hears state law claims, the conflicts laws of the forum state are used to determine which state's substantive law applies." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 661 (9th Cir. 1999). Under Oregon law, the parties can generally choose which state's substantive law controls.[1] *See* Or. Rev. Stat. § 15.350(1). The

---

[1] Pursuant to ORS 15.350(1), the parties' choice of law governs the contractual rights and duties of the parties except under certain circumstances that are inapplicable to this case.

parties in this case chose Delaware law to govern the terms of the Settlement Agreement. Am. Compl. Ex. 3 ("Settlement Agreement") at 7 (Section 11.7 reads: "Governing Law. This Agreement shall be governed in accordance with the laws of the State of Delaware.").

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Defendant moves for summary judgment on the grounds that Plaintiff cannot meet its burden on the second or third elements of its breach of contract claim. First, Defendant contends that Plaintiff cannot show that Defendant breached the terms of the parties' Settlement Agreement. Def. Mot. 2. Second, it argues that Plaintiff cannot demonstrate damages, the final element of a claim for breach of contract. *Id.* Separately, Defendant also argues that Plaintiff cannot show irreparable harm from the acts of Defendant, and Plaintiff's request for a permanent injunction must be denied.

## I.    Breach of the Settlement Agreement

Plaintiff contends that the Defendant breached the settlement agreement in two ways. First, Plaintiff argues that Defendant breached Section 3.4 of the Settlement Agreement when it developed its Vivo and OxiChek products, which Plaintiff alleges were specifically designed to test for oxidative stress and aldehydes. Pl. Resp. Def. Mot. Summ. J. ("Pl. Resp.") 1; Am Compl. ¶ 28. Second, Plaintiff contends that Defendant breached Section 5 of the Settlement Agreement by using "the designs and know-how of the Pulse Technology in its OxiChek product." *Id.* On Plaintiff's first allegation of breach, Defendant argues that the contract's terms only give Plaintiff an exclusive license to Assigned Technology in the field of Aldehyde Tests and, in any event,

that its OxiChek product does not test for aldehydes. As to the second allegation, Defendant

argues that its OxiChek product did not use any Technology developed by Plaintiff.

A.      Defendant's Alleged Breach of Section 3.4 of the Settlement Agreement

First, Plaintiff contends that Defendant breached Section 3.4 of the Settlement

Agreement, which provides that Plaintiff has an "exclusive . . . license under the Assigned

Technology and the ABI Patents to make, have made, use, sell, offer for sale, import and

otherwise distribute and dispose of products that use or incorporate any Assigned Technology in

the field of Aldehyde Tests as defined in Section 1.3." Am. Compl. Ex. 3 § 3.4.  The parties

dispute both the meaning of the term "Aldehyde Test" as defined in the Settlement Agreement

and whether Defendant breached Section 3.4 of the Agreement.

a.   Interpretation of Section 1.3 of the Settlement Agreement

Because the parties dispute the meaning of "Aldehyde Test" as used the Settlement

Agreement, the Court must first interpret Section 1.3 of the contract. Section 1.3 defines

"Aldehyde Tests" as "tests that qualitatively or quantitatively detect the presence of aldehydes in

human exhaled breath or breath condensate for the detection of free radical damage, cell damage

or cell death, oxidative stress, and interventions to mitigate oxidative stress." *Id.* at § 1.3

(emphasis added). Section 1.3 goes on to exclude from the definition "Alcohol Breath tests,

Ketone Breath Tests, or Pulmo Health Breath Tests." *Id.* Defendant argues that the plain

language of the Agreement limits "Aldehyde Tests" to those tests that detect aldehydes in human

breath. Def. Mot. 13. Plaintiff responds that this section is ambiguous as a reasonable person

could read Section 1.3 broadly to include "tests for oxidative stress." Pl. Resp. 16. The Court

agrees with Defendant.

"In Delaware, the interpretation of contracts is a matter of law for the court to determine." *Cont'l Warranty, Inc. v. Warner*, 108 F.Supp.3d 256, 259 (D. Del. 2015). The court "give[s] priority to the intention of the parties" and "start[s] by looking to the four corners of the contract to conclude whether the intent of the parties can be determined by its express language." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) (internal citations omitted). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *GMG Capital Invs.*, 36 A.3d at 780 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc*, 616 A.2d at 1196. Where the contract terms "establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language," they are clear and unambiguous and control the parties' dispute. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Conversely, contract terms are ambiguous when they are "fairly susceptible of different interpretations or may have two or more different meanings." *Id.* Where an agreement is ambiguous, the court may turn to extrinsic evidence "to ascertain the parties' intentions." *Id.*

Defendant asserts that the meaning of Section 1.3 is clear and unambiguous and subject to one reasonable interpretation. Def. Mot. 14–17. According to Defendant, Aldehyde Test in Section 1.3 is limited to only those tests that qualitatively or quantitatively detect the presence of aldehydes in human exhaled breath or breathe condensate. In other words, the exclusive license granted to Plaintiff under Section 3.4 only covers products that use or incorporate the Assigned Technology to test for the presence of aldehydes in human exhaled breath.

Defendant's interpretation is reasonable and supported by the plain language of Section 1.3. Section 1.3 reads: "'Aldehyde Tests' shall mean tests that qualitatively or quantitatively detect the presence of aldehydes in human exhaled breath or breath condensate for detection of free radical damage, cell damage and cell death, oxidative stress, and interventions to mitigate oxidative stress." Am. Compl. Ex. 3 § 1.3. A reasonable person in the position of the parties would understand that Aldehyde Test as used in the contract is limited to those tests that detect aldehydes in human breath in order to detect, among other things, oxidative stress.

Plaintiff contends that the definition of Aldehyde Test in Section 1.3 is susceptible to an alternative interpretation. Specifically, it argues that "Aldehyde Test" can be read broadly to encompass "tests that qualitatively or quantitatively detect . . . oxidative stress." Pl. Resp. 16. Plaintiff argues that its interpretation is bolstered by (1) the plain language of Section 1.3; (2) the sentence in Section 1.3 that clarifies that Aldehyde Test does not include Alcohol Breath Tests, Ketone Breath Tests, or Pulmo Breath tests; (3) the broad definition of "Assigned Technology" which includes "Technology 'hereafter owned or controlled by ABI which relates in any way to non-invasive exhaled breath testing." *Id*. at 16–17.

Plaintiff's interpretation is not reasonable. First, Plaintiff's reading omits key portions of Section 1.3 to suggest that "oxidative stress" modifies "tests." But closer inspection of the

language indicates that "oxidative stress" modifies "tests that . . . detect the presence of aldehydes." The drafters also included the preposition "for" between "aldehyde tests" and "oxidative stress" to indicate that the only aldehyde tests covered by the agreement are those used "for detection" of certain health markers. "For," *Webster's Third New Int'l Dictionary* (2002). In other words, "oxidative stress" clarifies that the aldehyde tests the parties were concerned with include only those tests that detect aldehydes *for the purpose of* detecting oxidative stress.

Second, the other material terms that Plaintiff cites do not overcome the plain language of the Section 1.3. Under either Defendant's or Plaintiff's interpretation, the clarifying language in the second sentence of Section 1.3 is meant to do just that: clarify that Aldehyde Tests do not include Defendant's Alcohol, Ketone, and Pulmo Health breath tests. And Plaintiff offers no support for its contention that it "doesn't make sense" for the Settlement Agreement to define "Assigned Technology" broadly to include technology related to non-invasive breath testing and give Plaintiff only an "extremely narrow aldehyde field in which to practice it." Pl. Resp. 17. Perhaps Defendant wanted to reserve for itself the ability to use the Assigned Technology in other fields. Regardless, neither term bolsters Plaintiff's argument. Nor do the terms suggest that Defendant's narrower approach to Section 1.3 conflicts with the overall scheme or plan of the Agreement, a part of which was to grant Plaintiff an exclusive license to use the Assigned Technology to test for aldehydes in human breath with the ultimate purpose of detecting oxidative stress levels.

Accordingly, the Court finds that Section 1.3 is not "susceptible of different interpretations" or "two or more different meanings." *See Eagle Indus.,* 702 A.2d at 1232. The Court agrees with Defendant that the plain language is unambiguous and finds that "a reasonable

person in the position of the parties" would view Section 1.3 as defining Aldehyde Tests as tests that detect the presence of aldehydes in human breath for the purpose of detecting, among other things, oxidative stress. *See id.*

### b. Breach

In order to prove that Defendant breached Section 3.4 of the Settlement Agreement, Plaintiff must demonstrate that Defendant used the "Assigned Technology in the field of Aldehyde Tests" as defined in the preceding section. Defendant contends that Plaintiff "has no evidence that [Defendant] sells a product that tests for aldehydes in exhaled human breath" and its "witnesses and documents confirm that [Plaintiff's] own testing of [Defendant's] OxiChek product showed that OxiChek does not test for aldehydes in human breath." Def. Mot. 9 (emphasis in original). Plaintiff, by contrast argues that both Defendant's Vivo and OxiChek products test for—or were designed to test for—the presence of aldehydes in human breath. Pl. Resp. 18–21. Because there are disputes of material fact that bear on whether Defendant breached the Settlement Agreement, and a jury could draw reasonable competing inferences from the evidence presented, summary judgment is inappropriate on this element of Plaintiff's claim.

### i. Vivo

In its motion and reply, Defendant does not address its Vivo product, which Plaintiff alleges in its complaint violated the terms of the Settlement Agreement. Am. Compl. ¶¶ 19, 20. At oral argument, Defendant acknowledged that its sale of the Vivo product violated the Settlement Agreement. And, in its response to Defendant's motion, Plaintiff provides evidence to suggest that the Vivo product used Assigned Technology to test for Aldehydes. Documents that describe the product's reagents suggest the products use similar or nearly identical chemical

reagents. *Compare* Hahon Decl. Ex. 5 at 1 (formulation of FRED Detection Reagent) *with* Rounds Decl. Ex. 7 at 1 (describing materials for Vivo Coating Reagent). Mr. Feldman, Defendant's lab manager, referred to Vivo as "second generation FRED." Rounds Decl. Feldman Dep. 10:4–15, 16:4–5. Both Mr. Akers and Mr. Feldman also admit that the Vivo reagent measured aldehydes in exhaled breath. *Id.* at Akers Dep. 101:9-25; *id.* at Feldman Dep. 17-11–14. Mr. Akers similarly admitted concern that the sale of the product breached the settlement agreement. *Id.* at Akers Dep. 103:16–21. Defendant initially sold 25 Vivo products in 2012 to former employees of Plaintiff, *id.* at 101:9–25, and later sold its "remaining inventory of Vivo reagents" in 2015 for $55,000, *id.* at 140:21–141:7. Defendant is therefore not entitled to summary judgment on this element of Plaintiff's breach of contract claim.

ii.     OxiChek

With regard to the OxiChek device, Plaintiff contends that Defendant breached the Settlement Agreement with its OxiChek device by using a Schiff reagent that was specifically designed for the FRED/Revelar device to test for Aldehydes.[2] Rounds Decl. Ramanujachary Dep. 33:10–35:25; *id.* at Akers Dep. 35:5–36:18. Plaintiff also notes that Defendant's product inserts, press release, sell sheets, and presentation to a distributor all claim that the OxiChek device was intended to test for Aldehydes. *Id*. at Exs. 14–19. Finally, Plaintiff cites to Defendant's engineering notebooks, which show "more than thirty tests to ensure that the OxiChek accurately tests for Aldehydes." Pl. Resp. 13 at ¶ 52 (citing Rounds Decl. Exs. 12–13). And Plaintiff points out that, contrary to Defendant's argument that the OxiChek was designed to test for hydrogen peroxide and superoxides, only one test was ever conducted to determine OxiChek's ability to test for these compounds. Rounds Decl. Ex. 12 at 26–27; *id*. at Cougan Dep.

---

[2] In its Reply, Defendant moves to limit or strike Dr. Pluth's testimony on the grounds that it is speculative and does not comply with FRE 702. Def. Reply Mot. Summ. J. ("Def. Reply") 13–15. The Court has not relied on Dr. Pluth's testimony for the purposes of this motion and, accordingly, declines to reach this issue at this point in the litigation.

58:8–23. The test was conducted only after litigation commenced in this suit. *Id.* Plaintiff's

testing also indicates that the OxiChek does not reliably test for either substance. *Id.* at Marsh

Dep. 98:4–17 (indicating it does not test for "any other chemical"); Young Decl. ¶¶ 2–9, ECF 63.

Defendant argues that it did not breach the settlement agreement with its OxiChek device

because the device does not accurately test for aldehydes or use the assigned technology. Def.

Mot. 19. In support of this argument, Defendant notes evidence from two of Plaintiff's

employees that reported the OxiChek device is "unreactive to aldehydes . . . ." DiMarino Decl.

Ex. L at 26. Similarly, Defendant provides deposition testimony of two of Defendant's

employees indicating that "the OxiChek device was tested extensively with aldehydes" but the

device did not successfully test for them. Def. Mot. (citing Ex. O (Cougan Dep.) 41:9–16, 66:3–

68:4 and Ex. P (Feldman Dep.) 22:20–26:22, 32:23–33:12, 35:5–9). In response to Plaintiff's

citation to various documents associated with marketing the device, Defendant contends that this

was merely an oversight that was corrected once Defendant was alerted to the issue. DiMarino

Decl. Ex. I (Akers Dep) 120:5–133:18.

From this evidence, multiple inferences can be drawn as to whether Defendant used the

OxiChek device to commercially exploit the Assigned Technology in the field of Aldehyde

Tests.[3] While Defendant may not have actually sold a device that consistently or accurately

measured aldehydes in human breath, there is an issue of fact on whether it commercially

exploited a device that it held out as doing so. Plaintiff points to many marketing and sales

materials where Defendant holds out the OxiChek as measuring aldehydes in human breath.

---

[3] The Court also notes that Defendant's reply on the use of the reagent misses the mark. It acknowledges Plaintiff's argument that the Vivo and OxiChek products use "the precise Schiff test for aldehydes that [Defendant] developed for [Plaintiff's] FRED/Revelar products that [Plaintiff] is exclusively licensed to use." Def. Reply 11 (citing Pl. Resp. at 10). But Defendant goes on to assert that Plaintiff ignores Section 5, which only prevents Defendant from using Pulse Technology. *Id.* (citing Section 5). However, the provision at issue here is Section 3.4, which gives Plaintiff an exclusive license to use the Assigned Technology, a category wholly distinct from Pulse technology that appears to include the reagent. Am. Compl. Ex. 2 at 18 (Schedule 1.5 "Description of Assigned Technology"). It is, therefore, immaterial whether Pulse developed or owned this reagent.

Further, contrary to Defendant's assertion that the device was meant for testing superoxides and hydrogen peroxides, only one test to measure the device's accuracy in testing these compounds was ever performed. Though Defendant contends that the description in these sales and advertising materials was a mistake, Defendant still commercially exploited, offered for sale, and sold a device that the buyer may have believed was a device that accurately measured the presence of aldehydes on human breath. Because the evidence creates competing reasonable inferences regarding whether Defendant commercially exploited or offered for sale a device that tests for aldehydes, this determination is more appropriate for the trier of fact. Accordingly, summary judgment in Defendant's favor is not warranted on Plaintiff's breach of contract claim.

**B.     Defendant's Alleged Breach of Section 5 of the Settlement Agreement**

Plaintiff also alleges that Defendant's OxiChek device uses Plaintiff's technology in violation of Section 5 of the Settlement Agreement. Pl. Resp. 21. Specifically, Plaintiff argues that the OxiChek product uses the know-how and designs from Plaintiff's FRED/Revelar reader. *Id.* Defendant contends both that its product does not use Pulse Technology and that Plaintiff's claim is barred by federal patent preemption because this Technology had already been publicly disclosed. The Court finds that Plaintiff's claim is not preempted by federal patent law and that there is an issue of material fact with regard to the alleged breach of Section 5 of the Settlement Agreement.

**a.  Preemption**

In its reply, Defendant raises for the first time its argument that Plaintiff's breach of contract claim is preempted by federal law because the information used by Defendant to

allegedly breach the contract was publically available.[4] Specifically, Defendant argues that because Plaintiff's Technology was already in the public domain—both the device as a whole and the individual components—the use of any state law to interfere with the public accessibility of that Technology is preempted by federal patent law. Def. Reply 17; Def. Resp. Pl. Surreply Def. Mot. Summ. J. 5, ECF 72. Plaintiff responds that federal preemption is inapplicable here because this case seeks to enforce a private right established between the parties via contract. Pl. Surreply Def. Mot. 4, ECF 71.

"Federal Circuit law governs whether federal patent law preempts a state law claim." *Ultra–Precision Mfg., Ltd. v. Ford Motor Co*., 411 F.3d 1369, 1376 (Fed. Cir. 2005). "Because federal patent law does not provide explicit preemption, and because Congress does not intend to occupy exclusively the field of unjust enrichment law [or contract law], we are concerned in this case only with conflict preemption." *Id.* at 1377 (internal citations omitted); *see also Smith v. Healy*, 744 F.Supp.2d 1112, 1117 (D.Or. 2010) (same). Conflict preemption "involves a consideration of whether that law stands as an obstacle to the accomplishment and execution of the full purposes of the objectives of Congress." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) (internal citations and quotations omitted).

"Federal law preempts state law that offers 'patent-like protection' to discoveries unprotected under federal patent law." *Ultra–Precision*, 411 F.3d at 1377–78 (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989)). The Supreme Court has identified the core objectives of the federal patent system: (1) "foster and reward invention;" (2) "promote[] disclosure of inventions, to stimulate further innovation and permit the public to practice the invention once the patent expires;" (3) "assure that ideas in the public domain

---

[4] Defendant only includes this argument in the section of its reply regarding the use of Plaintiff's Technology under Section 5 of the Settlement Agreement. Accordingly, the Court has only considered it with relation to this part of Plaintiff's breach of contract claim.

remain there for the free use of the public" through the stringent requirements for patent

protection, *Aronson,* 440 U.S. at 262; (4) demarcate between public and private property; and (5)

"provide nationwide uniformity in patent law," *Bonito Boats*, 489 US at 162. "A state cause of

action that frustrates these objectives is preempted." *Ultra–Precision*, 411 F.3d at 1378.

In *Aronson*, the seminal case on federal patent preemption, the Supreme Court held that a

contract for royalty payments was not preempted by federal patent law. 440 U.S. at 266. There,

the petitioner had entered into a contract with the respondent for the manufacture and sale of a

new form of keyholder. *Id.* at 259. The terms of the contract required the respondent to pay the

petitioner a royalty every year for "the exclusive right to make and sell key holders of the type

shown" in the petitioners then-pending patent application. *Id.* A second contract provided that,

in the event the petitioner's patent application was not approved within five years, the royalty

rate would reduce by half. *Id.* After selling the device for almost fifteen years, the respondent

brought an action seeking "a declaratory judgment . . . that the royalty agreement was

unenforceable" as preempted by patent law. *Id.* at 260. The Court found that the enforcement of

the contract between the parties was not inconsistent with the purposes of the federal patent

system. *Id.* at 262. It emphasized that the agreement would not withdraw the idea from the public

domain as "the design for the keyholder was not in the public domain before [the respondent]

obtained its license," *id.* at 263, and "[did] not prevent anyone from copying the keyholder," *id.*

at 264. The Court noted:

> Enforcement of these contractual obligations, freely undertaken in arm's-length
> negotiation and with no fixed reliance on a patent or probable patent grant, will
> "encourage invention in areas where patent law does not reach, and will prompt
> the independent innovator to proceed with discovery and exploitation of his
> invention. Competition is fostered and the public is not deprived of the use of
> valuable, if not quite patentable, invention."

*Id.* at 266 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 485 (9th Cir. 1974)).

By contrast, the Federal Circuit in *Ultra-Precision* found that the plaintiff's claim for unjust enrichment was preempted by federal patent law. 411 F.3d 1369, 1382 (Fed. Cir. 2005). It held that "[i]n the absence of an incremental benefit conferred, any attempt to obtain a patent-like royalty for the making, using, or selling of a product in the public domain under the rubric of state unjust enrichment law is preempted." *Id.* There, the plaintiff sued the defendant—Ford Motor Company—for unjust enrichment after the defendant produced an air conditioner compressor that allegedly used the plaintiff's ideas to reduce noise, vibration, and harshness. *Id.* at 1371–72. The court emphasized that the plaintiff was seeking damages for what the court characterized as "the benefit the public received when [the plaintiff] published the technical information" that was allegedly misused by the defendant rather than damages for an "incremental benefit." *Id.* at 1379–80. The plaintiff "ha[d] not claimed breach of a confidential relationship," withdrew its contract claim, and "[made] no claim that the discussions it had with [the defendant] gave [the defendant] 'the opportunity to be first on the market.'" *Id.* at 1381–82 (citing *Aronson*, 440 U.S. at 266). Thus, the court found that the plaintiff sought "a patent-like remedy for [the defendant's] conduct in making, using, and selling products embodying information [the plaintiff] was not successful in protecting under the federal patent laws and which is free for all the world to enjoy." *Id.* at 1382.

With these cases in mind, it becomes clear that Plaintiff's claim is not preempted by federal patent law. First, Plaintiff brings a breach of contract action—not a claim for unjust enrichment. As the Federal Circuit Court noted in *Ultra-Precision,* there is good reason to treat breach of contract differently. *Ultra-Precision*, 411 F.3d at 1382 ("Drawing a line between contract claims and unjust enrichment claims, for preemption purposes, is not unprecedented.

Allowing state to enforce contracts is consistent with allowing states to protect against misappropriation of trade secrets.").

Second, Plaintiff's claim for damages relates to the breach of its contract. In other words, it seeks incremental damages related to its contractual rights. Plaintiff bargained and negotiated for a right to the Technology to the exclusion of Defendant, and it lost the benefit of its bargain when Defendant used this Technology. Thus, rather than seeking damages for mere use—as may be the case under an unjust enrichment claim—Plaintiff seeks damages related to the loss of a contractual benefit.

Third, the enforcement of Plaintiff's breach of contract claim would not stand as an obstacle to the purposes of federal patent law. Though Plaintiff's device was already in the public domain (unlike *Aronson*) and there was no confidentiality agreement in place, the breach of contract claim here does not prevent the disclosure of an invention, prevent *the public* from using the invention, or remove it from the public domain. It only limits Defendant—the other party to the contract—from using it in a particular way. Further, by holding the parties to the terms of their contracts it fosters and rewards invention by allowing inventors to engage in collaborative work on their own terms. The Court, therefore, finds that this claim is not barred by federal patent preemption.

### b. Breach

The parties dispute whether the OxiChek device uses Pulse Technology in violation of the Settlement Agreement. Plaintiff argues that Defendant used Pulse Technology in the form of "designs and know-how" for the FRED/Revelar reader in developing its OxiChek device. Those designs and know-how include:

(a) the design of a light emitting diode ("LED") to illuminate the reagent and then a colored optical sensor to read the reflected light of the reagent in order to

generate a numeric output score; (b) a "switch" to activate the reader when a breath cartridge or tube is inserted in the reader; and (c) electronic components called "NAND gates" that send signals to the micro-controller indicating that an electronic "latch" that keeps the device powered on until instructed to turn off by the microcontroller.

Pl. Resp. 21; *see also* DiMarino Decl. Ex. M (Carlsen Dep.) 20:2–21:22, 22:4–23:12; Rounds Decl. Daniel Dep. 31:2–33:14, 36:15–37:17, 56:5–12, 67:6–12.

 Defendant, by contrast, contends that the OxiChek device does not use any of the FRED/Revelar technology. Def. Mot. 20. Defendant admits that both devices are colorimeters, but asserts that this technology has been available for over a century and was not developed by Pulse. DiMarino Decl. Ex. D (Def. Resp. Pl. Interrog. No. 10) at 8. Defendant also notes that Mr. Carlsen, Plaintiff's 30(b)(6) witness on this issue, "testified that the components, electrical or otherwise, of the devices are simply not the same." Def. Mot. 21 (citing Carlsen Dep. 21:1-26:6, 25:2-12, 29:8-30:22, 35:2-36:1).  Further, Defendant argues that Plaintiff has not provided any evidence that it developed the components used in the OxiChek product, which Mr. Carlsen indicated were "basic elements." Def. Reply 15 (citing Carlsen Dep. 35:2-37:1). Defendant contends that Plaintiff merely suggests that its FRED/Revelear device *used* these various components. *Id.* at 16. As "using such items is not the same as developing them, as is required under Section 5 of the Settlement Agreement," Defendant argues that is entitled to summary judgment on this issue. *Id.*

As a preliminary matter, Defendant's argument unreasonably narrows "Technology" to refer only to "items" or "components" wholly developed by Plaintiff.  Defendant is correct that Section 5 only gives Plaintiff the unlimited right to use Technology that it developed: "[Plaintiff] has the unlimited right to use and otherwise commercially exploit all Technology *developed* by Pulse, including any modifications, improvements, or additions to the Assigned Technology."

Am. Compl. Ex. 3 at § 5. However, Technology is defined broadly to include "inventions, processes, *designs*, copyrights, trade secrets, *know-how*, trademarks, domain names, development, improvements, tests, software, and intellectual property rights of any nature whatsoever." *Id.* at § 1.7 (emphasis added). Thus, Defendant's reasoning that it is entitled to summary judgment because both devices merely *used* items that were developed by a third-party is unpersuasive. It is enough, under the terms of the contract, that Defendant used or commercially exploited know-how or designs developed by Plaintiff in making its OxiChek device.

In addition, there is a dispute of material fact regarding whether the OxiChek device uses designs and know-how from the FRED/Revelar device. Neither party disputes that the FRED/Revelar device was understood as part of the Technology that Plaintiff had exclusive rights to under the Settlement Agreement. Rounds Decl. Akers Dep. 90:25–91:7. But the extent to which Defendant's OxiChek device utilized the design and know-how associated with Plaintiff's Technology is unclear. On one hand, Plaintiff presents deposition testimony of two of its witnesses regarding the similarities between the designs of both devices, including the manner and use of an LED, switch, and NAND gates. DiMarino Decl. Ex. M, (Carlsen Dep.) 20:2–21:22, 22:4–23:12; Rounds Decl. Daniel Dep. 31:2–33:14, 36:15–37:17, 56:5–12, 67:6–12. On the other, Defendant notes that some of these similar components are fairly "generic" and colorimeters have been in use for over a century. Def. Mot. 10–11 (citing DiMarino Decl. Ex. D (Def. Resp. Pl. Interrog. No. 10) at 8 and Ex. M (Carlsen Dep.) 21:1–23:6). And Defendant cites evidence indicating that there are some differences in the manufacturer of the different components and design and appearance of the components of the devices. DiMarino Decl. Ex. M

(Carlsen Dep.) 20:2–21:7, 25:5–12, 29:9–30:22. Accordingly, this is a question that is best left for the trier of fact.

## II.     Damages

### A.  Monetary Damages

Defendant also alleges that Plaintiff "cannot prove the final damages element of the contract claim because there is <u>no evidence</u> in the record to establish a causal relationship between [Defendant's] alleged breach of the Settlement Agreement and any purported damages suffered by [Plaintiff]." Def. Mot. 22 (emphasis in original). In order to succeed on a claim for breach of contract under Delaware law, a plaintiff has to prove by a preponderance of the evidence that it suffered damages as a result of a defendant's breach. *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, CA No. 7471-VCP, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013). In other words, "a breach of contract claim requires a showing of compensable injury." *Id.* at *19. "To satisfy the final element, a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *Id.* at *13. Though, "[a] plaintiff . . . 'cannot recover damages that are merely speculative or conjectural,'" *id.* at *19 (quoting *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004)), a plaintiff "need only to lay a reasonable foundation by which the Court may estimate their loss," *LaPoint v. AmerisourceBergen Corp.*, No. Civ.A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007).

Generally, "no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Siga Techs., Inc., v. PharmaAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015). But "[w]here the injured party has proven the *fact* of damages— meaning that there would have been some profits from the contract—less certainty is required of

the proof establishing the *amount* of damages. *Id.* (emphasis in original). "In other words, the injured party need not establish the amount of damages with precise certainty 'where a wrong has been proven and the injury established.'" *Id.* (quoting *Del. Exp. Shuttle, Inc. v. Older*, No. Civ.A. 19596, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)).

Defendant argues that Plaintiff's "claim to any expectancy damages is purely speculative." Def. Mot. 23. Defendant contends that the only possible expectancy damages Plaintiff could recover would be from its sale of a device that tests for aldehydes, but that Plaintiff "cannot prove that it is or was precluded from selling a device that tests for aldehydes in exhaled human breath, or that it has been impacted in any way vis-à-vis the sale of such a device as the result of any conduct by [Defendant]." *Id.* at 22. Plaintiff responds that "breach of a contract is a legally cognizable injury by itself" and that it paid $675,000 for the exclusive license, a portion of which it would expect as a royalty in the event of a breach. Pl. Resp. 23. It further alleges that it would expect some similar form of payment from Defendant's use of Plaintiff's Technology. *Id.* In the alternative, Plaintiff alleges that it would be entitled to nominal damages for Defendant's "material breach" if it could not prove expectation damages. *Id.* at 23 n.11.

Here, Plaintiff has failed to provide evidence of damages provable to a reasonable certainty. First, the Settlement Agreement does not clearly state that Plaintiff paid $675,000 for the exclusive license. Instead, it states Defendant waived the remainder of the $3,000,000 payment owed by Plaintiff for the return of certain rights under the parties' previous contracts. Am. Compl. Ex. 3 at §§ 2.1–2.2. In other words, it would be more appropriate to state that Plaintiff paid $675,000 for work performed by Defendant under the previous contracts and to retain the exclusive license under the Settlement Agreement.

Second, Plaintiff presents no evidence from which the trier of fact could reasonably determine what amount of its payment is properly attributable to the license that was allegedly breached or what the amount of any royalty payment for the use of the technology would be. In support of its argument, Plaintiff cites to the declaration and deposition of its CEO and its supplemental response to Defendant's Interrogatory No. 4. Mr. Marsh states that Plaintiff paid $675,000 to develop the technology and that the $3 million value of the prior contract indicates that the technology is valuable. Rounds Decl. Marsh Dep. 114:8–115:3. He also states that the "damage for [Plaintiff] is that [Defendant is] in the marketplace polluting the market" and violating the agreement, *id.,* and that Plaintiff had a "reasonable expectation" that it would receive payment for any breach, Marsh Decl. ¶ 6, ECF 60; *see also* DiMarino Decl. Ex. C (Pl. Resp. Def. Interrog. 4) at 31–32. In the alternative, Plaintiff suggests that its "damages are based on a reasonable royalty of 25% of [Defendant's] gross sales of the Vivo and OxiChek products," but with no additional evidence on what the gross sales were or why the royalty would be 25% of those sales. DiMarino Decl. Ex. C (Pl. Resp. Def. Interrog. 4) at 31–32. Such allegations, without more, are insufficient under Delaware law. While it seems likely that Plaintiff did suffer some amount of damages, Plaintiff has so far failed to provide a sufficient evidentiary foundation from which the trier of fact could reasonably calculate the value of its injury.

However, Plaintiff may be entitled to nominal damages. Under Delaware law, "where the amount of damages may not be estimated with reasonable certainty despite a showing of breach on the part of defendant, the Court may still award nominal damages." *LaPoint*, 2007 WL 2565709, at *9. "The allowance of nominal damages is generally based on the ground either that every injury from its very nature legally imports damage, or that the injury complained of would in the future be evidence in favor of the wrongdoer." *Palmer v. Moffat*, No. Civ.A. 01C-03-

114JEB, 2004 WL 397051, at *4 (Del. Super. Ct. Feb 27, 2004). "It is repeatedly announced by the Courts that, where the Plaintiff establishes the fact of loss in contract, but not its amount, he may recover nominal damages." *USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 23 (Del. Super. Ct. 2000) (citing Charles T. McCormick, *Handbook on the Law of Damages,* 91 (1935) and Arthur L. Corbin, *Corbin on Contracts* § 1001 (1964)). "Nominal damages are 'not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff.'" *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC,* No. CIV.A. 3158-VCL, 2009 WL 1111179, at *14 (Del. Ch. Apr. 27, 2009) (citing *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, No. Civ.A. 20405-NC, 2005 WL 3502054, at *15 (Del.Ch. Dec.15, 2005)).

Defendant conceded at oral argument that its Vivo device breached the terms of the Settlement Agreement, and Plaintiff has at least created a genuine issue of fact as to whether the OxiChek device does as well. Further, there is evidence in the record that suggests both devices were sold by Defendant. *See* Rounds Decl. Akers Dep. 101:9–25, 140:21–141:7 (discussing sales of the Vivo device); *id.* at 128:15–25 (confirming that there was an agreement for the distribution of the OxiChek device). The Court therefore is reasonably certain that Plaintiff suffered some damage and finds that Plaintiff may be entitled to nominal damages.

B.  Injunctive Relief

In its complaint, Plaintiff also requests "specific performance and an injunction prohibiting the manufacture, use, and sale of ABI's OxiChek product." Am. Compl. at 9. In order to obtain a permanent injunction under Delaware law, the moving party must demonstrate: (1) success on the merits of the moving party's claim; (2) irreparable harm if injunctive relief is not granted; and (3) "the harm that would result if an injunction does not issue outweighs the

harm that would befall the opposing party if the injunction is issued." *Draper Commc'ns, Inc. v. Delaware Valley Broads. Ltd. P'ship.*, 505 A.2d 1283, 1288 (Del. Ch. 1985); *see also Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc.*, No. 3369-VCP, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009) (applying this standard to a request for a permanent injunction barring the defendant from violating a non-compete provision). Specific performance of a contract requires that the plaintiff establish, "by clear and convincing evidence, (1) that a valid and specifically enforceable contract exists between the parties; (2) that the party seeking performance was ready, willing, and able to perform under the terms of the contract; and (3) that the balance of the equities favors an order of specific performance." *Szambelak v. Tsipouras,* No. Civ.A 936-VCN, 2007 WL 4179315, at *4 (Del. Ch. Nov. 19, 2007). "When balancing the equities, [the court] must be convinced that specific performance of a validly formed contract would not cause even greater harm than it would prevent." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010) (internal citations and quotations omitted).

Defendant contends that Plaintiff cannot obtain injunctive relief because it has not been irreparably injured by any conduct by Defendant. Def. Mot. 23. Plaintiff responds that specific performance and injunctive relief are a "common remedy" for a prohibition clause and are often appropriate where damages are difficult to calculate or will not offer complete compensation for breach. Pl. Resp. 23–24.

Neither party clearly applies all the factors of the tests for injunctive relief and specific performance to the facts of this case. However, given the nature of the exclusive license provision at issue and Defendant's alleged prior violations of the settlement agreement, equitable relief may be warranted. The Court, accordingly, declines to grant summary judgment to Defendant on this issue.

**CONCLUSION**

Defendant's Motion for Summary Judgment [57] is DENIED.

IT IS SO ORDERED.

Dated this _____ day of June, 2018.

_____
MARCO A. HERNÁNDEZ
United States District Judge